**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **LAURENCE WASHINGTON,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Case No. 3:17-cv-1316 (VLB)** |
| | : | |
| | : | |
| | : | |
| **JUDGE DEWEY, ET AL.** | : | |
| **Defendants** | : | |


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


**ORAL ARGUMENT REQUESTED**

I.      **INTRODUCTION**

On May 16, 2016, Plaintiff Lawrence Washington ("Washington") witnessed Michael Gaston ("Gaston") murder Marshall Wiggins ("Wiggins"). Hours later, Washington did exactly what police departments throughout the country ask members of the public to do if they have information about a crime: He contacted the East Hartford Police Department ("EHPD") to report what he had seen. In a voluntary, videotaped interview with Defendants Frank Napolitano ("Napolitano") and Daniel Ortiz ("Ortiz"), two EHPD detectives, and supervised by Defendant Francis McGeough ("McGeough"), Washington shared everything he knew. He did not withhold the slightest detail, even if unflattering. He carefully wrote an eight-page statement. He identified Gaston in a photo array. He took, and passed, a DNA and gunshot residue test. And when it was all over, Washington told Defendants that he feared for his life. In response, McGeough put him up in a hotel at his own expense and helped arrange for Witness Protection. Based on Washington's account—which Napolitano swore in Gaston's arrest warrant was "credible" and "prudent"—Defendants were able to arrest Gaston. Then, based largely on Washington's testimony, a jury found Gaston guilty of first-degree murder, and he received a 50-year sentence.

Over the summer of 2016, Washington remained in Witness Protection. Defendants did no additional investigation; after they arrested Gaston, they seemingly closed the case. Later, Ortiz and Napolitano received commendations for their purportedly stellar work in solving Wiggins's murder so quickly. Considering the circumstances, one would have expected that Washington, too,

would have received a thank-you from the EHPD for his public service.

Instead, three months later, Napolitano drafted an arrest warrant affidavit, approved by McGeough, to arrest Washington for felony murder, first-degree robbery, and conspiracy. Defendants gave conflicting testimony about the circumstances of the decision to arrest Washington. They have never provided a remotely plausible reason why they waited over three months to arrest a supposed participant in a murder. The Washington affidavit states that it is based on information from "prudent and credible witnesses"—namely, Washington. Napolitano drafted it by simply cutting and pasting what he had drafted for Gaston, changing a reference to Washington from a "witness" to an "involved person," and adding a four-sentence addendum asserting that Washington "watched Gaston point a gun at Wiggins and order Wiggins to hand over his property" and "Washington was sitting in the back seat of the vehicle and could have exited the vehicle if he truly had no party in the robbery." Finally, he wrote that, "Video also shows Washington and Gaston arrive at the convenience store, converse with Wiggins, and leave with Wiggins, together."

The affidavit is telling for what it leaves out—all of the exculpatory information that Defendants knew. From the start, Washington has always said that he (1) did not know Gaston had a gun; (2) had no knowledge of Gaston's intentions; (3) was threatened by Gaston at gunpoint during the events in question; and (4) fled as soon as he was physically able. His account is corroborated by other evidence. There is video footage, which both contains no suggestion that Gaston had a gun or of conspiracy, and shows Washington

2

attempting to return to his own apartment rather than get in a car with Gaston and Wiggins. There was a shattered window in the rear passenger seat of the car, caused by a gunshot. There were hospital records indicating Washington sought treatment for trauma and called the police immediately thereafter. There is a lack of any contradictory evidence. And there is the fact that the Defendants offered Washington witness protection—something they freely admit is rarely done, and is not meant to be a substitute for arrest. Yet none of this information made its way into Defendants' affidavit. Moreover, its reasoning smacks of pretext. It concludes that merely being in the same place as Gaston suggests conspiracy, a theory long rejected by Connecticut law. It concludes that Washington must have been involved because he didn't flee immediately, even though Washington explained that Gaston had a gun pointed at him, and even though the EHPD advises witnesses not to interfere in a robbery or take action that would jeopardize safety.

Washington quickly won his probable cause hearing (representing himself) and was acquitted of the remaining charges following a bench trial (again largely representing himself) in an impassioned opinion by Connecticut Superior Court Judge Omar Williams. Still, Defendants' critical omissions cost Washington dearly—in the form of months of incarceration; separation from work and his young daughter; and severe emotional distress.

In their Motion, Defendants employ scattered post-hoc rationalizations to argue that they had probable cause to arrest Washington. They do so notwithstanding significant conflicting, and confusing, testimony regarding the

3

genesis of the arrest warrant, as well as the glaring omissions from the warrant affidavit itself. Based on the record and the law, this is not a case for summary judgment.

First, Defendants are estopped from relitigating probable cause. Connecticut Superior Court Judge Juliett Crawford found that there was no probable cause to believe Washington had committed felony murder, because there was no probable cause to believe he committed robbery. Because Defendants conducted no additional investigation, the facts before Judge Crawford were the facts before Defendants at the time of arrest. Her determination is thus binding.

In the alternative, summary judgment is improper because the multiple material omissions from Defendants' affidavit are relevant to a probable cause determination. Evaluating these omissions in the light most favorable to Washington, under a totality of the circumstances approach, it is impossible to say that they could *not* have affected a magistrate's decision to issue the arrest warrant—the only context in which summary judgment would be proper. How much weight to accord these omissions, and whether a "corrected" affidavit would support probable cause, is a question that must go to the factfinder. For this reason, a qualified immunity determination is also premature: The disputed facts bear on whether it was objectively reasonable for Defendants to conclude that probable cause existed.

At the end of the day, significant factual questions remain as to whether there was probable cause for Defendants to arrest Washington, who was

4

rewarded for his public service in helping put a murderer behind bars not with a commendation like Defendants, but with felony charges and months in prison until he was twice able to prove his innocence. Accordingly, Defendants' Motion must be denied.

## II.     FACTUAL BACKGROUND

### A.     Washington Witnesses Wiggins' Murder on May 16, 2016.

On May 16, 2016, upon returning to his apartment building in East Hartford after work, Washington ran into an acquaintance he knew only as "G" (later identified as Gaston). Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment at ¶ 7, 8, 71 ("Opp'n Stmt."). Gaston asked Washington if he had been watching the NBA playoffs. *Id.* at ¶ 8. After a casual conversation about sports, Washington went to his apartment. *Id.* at ¶ 9. Washington's friend "Black" came downstairs from his sister's apartment, and together they listened to music, watched the playoffs, drank alcohol, and smoked marijuana. *Id.*

Shortly thereafter, Gaston knocked on Washington's door and asked Washington if he wanted to smoke together. *Id.* at ¶ 10. Washington invited him in. *Id.* at ¶ 11. Washington, Black, and Gaston continued to smoke, drink, and watch the basketball game. *Id.* at ¶ 11-12. At halftime, they ran out of marijuana. *Id.* at ¶ 12. Washington assumed Gaston—who had been texting on his phone— knew where to buy more. *Id.* at ¶ 14. Washington decided to go with Gaston to Quick Stop Mini Mart, a convenience store about a mile from his apartment, with the understanding that they were going to buy cigarettes, soda, and marijuana. *Id.* at ¶ 13.

5

Washington and Gaston walked to the Quick Stop. *Id.* at ¶ 12. Upon arriving, they saw Wiggins, who Washington did not know. *Id.* at ¶ 15. As video footage shows, Gaston and Wiggins went to the back of the store, where Washington assumed Gaston was buying marijuana. *Id.* Meanwhile, Washington purchased several items and spoke with people in the store, including the clerk, about the game. *Id.*

After Gaston and Wiggins returned from the back of the store, Gaston and Washington went outside. *Id.* at ¶ 16. Washington turned and began to walk toward his apartment. *Id.* Gaston stopped him and explained that they would have to go to Wiggins' house around the corner in order to buy marijuana. Gaston said Wiggins would drop them off at Washington's apartment afterward. *Id. at* ¶ 16-17. Washington, believing that they were going solely to buy marijuana, walked to Wiggins's car. *Id.* at 80. Gaston asked Wiggins if Washington could come along for the ride, and Wiggins said he didn't care. *Id.* at ¶ 73.

Gaston got in the front passenger seat and Washington got in the back passenger seat. *Id.* at ¶ 18. Washington felt nauseous from the combination of the heat in the car, the alcohol he had previously drank, and the marijuana he had previously smoked. *Id.* at ¶ 19. He closed his eyes and rested his head while Gaston and Wiggins talked. *Id.*

When the car came to a stop, Washington opened his eyes. *Id.* at ¶ 20. He saw Gaston pointing a gun at Wiggins. *Id.* Washington did not know Gaston was carrying a weapon because he had never seen Gaston with a gun and had no indication Gaston had one. *Id.* at ¶ 80. Gaston told Wiggins to give Gaston his

rings and glasses. *Id*. at ¶ 21. When Wiggins did not comply with Gaston's demands, Gaston fired a shot. *Id*. Washington covered his face in response to the loud noise and flash from the gun. *Id*. at ¶ 79.

Washington told Gaston to calm down and asked him what he was doing. *Id.* at ¶ 78. Gaston then pointed the gun back and forth between Wiggins and Washington. *Id.* at ¶ 81. Washington felt afraid for his life and "stuck" as Gaston pointed the gun at his face*. Id.* He also decided that he would comply with Gaston's orders because he didn't want to get shot. *Id.* Based on Gaston's orders to Wiggins and Washington at gunpoint, Wiggins took off his glasses and dropped them into Washington's hand. *Id*. at ¶ 23. Wiggins simultaneously reached for the gun, and the two began to fight over it. *Id*. at ¶ 24.

Washington jumped out of the car and ran. *Id*. at ¶ 25. When Washington reached a nearby park, he realized he was still holding the glasses and immediately threw them on the ground. *Id*. at ¶ 25-26. He also started to panic that either Gaston or Wiggins would be following him, not knowing who would have survived the fight for the gun. *Id*. He decided to take off his sweatshirt and let down his hair. *Id*. Washington then ran back to his apartment. *Id*. at ¶ 27.

When Washington arrived, he found Black and told him that Gaston just "smoked someone." *Id*. at ¶ 86. Within minutes, Gaston arrived. *Id*. Washington tried to remain calm as Gaston pulled him into the hallway, telling him he needed Washington's help retrieving the murder weapon. *Id*. at ¶ 28, 87. Washington believed that this request was simply an attempt by Gaston to get Washington somewhere less conspicuous so that Gaston could kill him. *Id*. at ¶ 87. Fearing

7

for his life and thinking quickly, Washington lied to Gaston to get away from him, and then he fled out the back of the building to Hartford Hospital. *Id.* at ¶ 29, 88. Washington was feeling anxious, depressed, and traumatized by what he had seen. *Id.* at ¶ 31. Washington told hospital staff he was feeling suicidal, and he was held overnight. *Id.* at ¶ 90.

**B.    Washington Immediately Contacts the EHPD.**

Washington was discharged from Hartford Hospital the next afternoon. *Id.* at ¶ 32. He was picked up by Elizabeth Reyes, his daughter's mother. *Id.* Washington was still struggling to process the trauma of the previous night's events. *Id.* at ¶ 33. Upon seeing Ms. Reyes, Washington told her what he had witnessed and agreed that she should call the EHPD. *Id.* During that call, the police requested that Ms. Reyes put Washington on the phone. *Id.* She hung up, and then Washington immediately called back, reported that he had information on the murder, and agreed to come to the police station. *Id.* Because Washington did not have a car, Ortiz arranged for officers from the EHPD to come pick him up. *Id.* at ¶ 34. McGeough, Ortiz, and one additional officer picked Washington up from Ms. Reyes' house. *Id.* at ¶ 35.

At the station, Washington participated in a voluntary interview with Napolitano, the lead detective on the case, and Ortiz, his partner. *Id.* at ¶ 38. McGeough, the supervising officer, was present at the station and watched the interview intermittently through closed-circuit TV. *Id.*

Washington told Napolitano and Ortiz everything he had witnessed the night before. *Id.* Washington repeatedly told them that he "was scared for [his]

8

life"; that he wasn't going to say no to Gaston while he had a gun pointed at him; and that he would do whatever Gaston wanted and then go to the police—as he had. *Id.* at ¶ 91. Washington then wrote a statement, passed a gunshot residue test, and identified Gaston in a photo array. *Id.* at ¶ 37.

### C.   McGeough Offers Washington Witness Protection and Washington is Placed in Witness Protection.

At the end of the interview, McGeough entered the room and asked Washington if he felt safe. *Id.* at ¶ 39. Washington responded he did not because Gaston knew where he lived. *Id.* McGeough informed Washington he could be placed into Witness Protection. *Id.* at ¶ 42. Because it was too late to organize witness protection that night through the State's Attorney's office, Defendants transported Washington to a motel, booked him a room, and paid for his stay. *Id.* at ¶ 43. The following day, Defendants drove Washington to Hartford to be formally placed in Witness Protection. *Id.* at ¶ 44. Washington signed a Witness Protection Agreement on May 18, 2016. *Id.* at ¶ 46. Defendants consistently testified that Witness Protection is rarely used in their experience, and that it is not meant to be a substitute for arrest. *Id.* at ¶ 40.

Following his interview with Washington on May 17, 2016, Napolitano wrote a Supplemental Case/Incident Report on May 18, 2016, which McGeough later signed. *Id.* at ¶ 92. In this statement, Napolitano stated that Washington contacted the EHPD because he was a "witness" to the shooting. *Id.* He explained that Washington told him he was "so scared" during robbery, he wasn't sure if Gaston had shot Wiggins when he first fired the warning shot. *Id.* He stated Washington told him he yelled at Gaston that he was "crazy for doing this." *Id.* Napolitano

wrote that Washington had said he had no idea Gaston was going to rob Wiggins, and that he had no idea Gaston had a weapon. *Id.* Napolitano further wrote that Washington said he feared Gaston was going to kill him when he returned to his apartment after the shooting. *Id.* Defendants conducted no further investigation after interviewing Washington. *Id.* at ¶ 111.

> **D.**    Gaston is Arrested and Later Convicted Based on Washington's Statement.

On May 19, 2016, Napolitano drafted an arrest warrant affidavit for Gaston. *Id.* at ¶ 49. McGeough signed it, as did State's Attorney Gail Hardy. *Id.* at ¶ 50. The affidavit relied on video surveillance footage taken from the Quick Stop and Washington's witness statement. *Id.* at ¶ 95. The affidavit indicated that Washington was "prudent" and "credible," that Washington's statement matched the physical evidence and recovered video, and that he had information "only a witness would know." *Id.* After reciting what Washington had told him, Napolitano stated probable cause existed to charge Gaston with murder, felony murder, first-degree robbery, and two firearm charges. *Id.* at ¶ 49. Notably absent from this list of crimes is Conspiracy to Commit Robbery in the First Degree. *Id.*

After the warrant was issued, Gaston was arrested. *Id.* at ¶ 51. He was interviewed by Napolitano on June 7, 2016. *Id.* Gaston repeatedly lied throughout his interview—so much so that Napolitano told him point-blank that he was lying, because his answers did not match the Quick Stop surveillance video or Washington's statement. *Id.* at ¶ 93. Gaston did not say Washington was involved; in fact, he denied knowing who Washington was. *Id.* Napolitano concluded his case/incident report by stating that Gaston's account did not

match the surveillance video, witness accounts, or Washington's statement. *Id.*

On June 6, 2018, after a jury trial at which Washington testified, Gaston was found guilty of murder, felony murder, and robbery in the first degree. *Id.* at ¶ 53. Notably, he was found not guilty on one count, conspiracy to commit robbery—a later added charge. *Id.* At Gaston's sentencing on July 25, 2018, State's Attorney David Zagaja ("Zagaja") admitted that the necessary conclusion from the acquittal on the conspiracy charge was that the jury believed Washington had no knowledge of Gaston's intentions and no involvement. *Id.* at ¶ 97.

E.    **Defendants Decide to Arrest Washington Months Later.**

On June 7, 2016, Washington made a call to the Manchester State's Attorney's Office regarding his incarcerated girlfriend, Tasharia Webb. *Id.* at ¶ 54-55. Washington left a voice mail stating he wanted Webb to be released or else he would not continue to cooperate in the prosecution of Gaston. *Id.* at ¶ 56. Zagaja—the prosecutor assigned to the Gaston case and later assigned to Washington's criminal case—learned of Washington's phone call shortly after it was made via a letter sent to him at his office, which he placed in Gaston's case file. *Id.* at ¶ 94. Napolitano stated that Washington called him over the summer, but he could not recollect the substance of the call. *Id.* at ¶ 48. McGeough also spoke with Washington that summer. *Id.* Finally, Ortiz testified that Napolitano told him about Washington's call to Manchester *before* Washington was arrested. *Id.* at ¶ 58.

On August 31, 2016, Napolitano drafted an arrest warrant for Washington that McGeough reviewed and approved. *Id.* at ¶ 61; *see also* Opp'n Stmt. Ex. 2.

11

Notably, aside from the June 7, 2016 interview of Gaston where Napolitano

determined Gaston was lying, Defendants had not conducted any additional

investigation or discovered any new information regarding the murder since

Washington's May 17 interview. Opp'n Stmt. at ¶ 61, 99.

Defendants offered conflicting testimony regarding why they pursued a

warrant months after Washington gave his statement, and months after Gaston

was arrested. At times, they were simply unable to provide an explanation. Opp'n

Stmt. at ¶ 111 (citing Ex. 6, Napolitano Dep. Tr. at pp. 113:11-13 (Q: Do you know

why there was a delay between May 2016 and September 2016 in arresting Mr.

Washington? A: No.); Ex. 16, Probable Cause Hearing Transcript, January 17,

2017 at pp. 39:5-14) (similar); Ex. 9, Zajaga Dep. Tr., at pp. 97:17-19 (Q: Any

reason for the several month delay, to your knowledge? A: None to my

knowledge)).[1] Meanwhile, McGeough and Zagaja testified that Zagaja told

McGeough that Washington should be charged because it would look like

Washington was receiving favorable treatment for coming forward if he was not

charged. *Id.* at ¶ 102.

In addition to these shifting explanations, Defendants have failed to offer a

consistent story about what conversations occurred before the Washington

warrant was prepared.  For example, they can't identify when conversations

about arresting Washington took place. *See, e.g.,* Opp'n Stmt. at ¶ 59 (citing Ex. 9,

Zagaja Dep. Tr., at 97:25-98:4 (suggesting he spoke to Napolitano in June), Ex. 6,

---

[1] Asked for an explanation at Washington's criminal trial, Napolitano said
Washington wasn't arrested for months because he was in witness protection,
*see* Opp'n Stmt. Ex. 11, Washington Criminal Trial Tr., July 7, 2017, at 32:21-24.
Both McGeough and Zagaja flatly denied this suggestion. Opp'n Stmt. at ¶ 112-13.

Napolitano Dep. Tr., at p. 68:14-22 (stating he only began preparing the warrant in August), Ex. 8, McGeough Dep. Tr., at pp. 96:1-98:4 (suggesting he spoke with Zagaja in August). They aren't clear about whether Zagaja and Napolitano even spoke before Napolitano drafted the affidavit. Opp'n Stmt. at ¶ 59 (*Compare* Ex. 6 at p. 75:5-24 with Ex. 6 at p. 95:13-22) (Napolitano testified that he both did and did not have speak with Zagaja prior to drafting the warrant). Zagaja testified that he did speak with Napolitano, who had "no response" to being told to draft an arrest warrant affidavit for Washington, nor did he ask any questions. *Id.* at ¶ 59 (citing Ex. 9 at p. 68:14-16). McGeough, meanwhile, testified that Zagaja spoke directly with Napolitano. *Id.* (citing Ex. 8 at pp. 95:24-96:14).

In sum, there are significant issues of material fact regarding what Defendants knew about the call to Manchester; why they decided to arrest Washington months later even though the only additional evidence (Gaston's interview) supported Washington; when they decided to arrest Washington; and what was said in the conversations where it was decided to arrest Washington.

As submitted, the Washington affidavit stated the following, in relevant part:

> That on 5/7/16 I interviewed Washington at EHPD. Washington stated that he was with "G", walking to the convenience store on Main St. He said he had only recently met "G" a few weeks ago. He said, once inside the store "G" started talking to a very large black male. Wiggins is 6'8 and 350 pounds. He stated he had never met the male, but that "G" was trying to buy some "weed" from Wiggins. Washington stated he and "G" went outside and eventually got into Wiggins vehicle. Washington stated "G" got into the front passenger seat and he got into the back passenger seat. Washington stated that after doing a U-turn they drove south on Main St. for short distance before turning left onto a street that he is unfamiliar with. Washington stated that Wiggins then stopped the vehicle in a

driveway. Washington stated that when the vehicle stopped, "G" pulled out a black revolver with his right hand and pointed it at Wiggins, ordering Wiggins to give him his glasses and jewelry.

That Washington stated he started yelling at "G" that he was crazy and that he wanted no part in this. Washington stated that he was scared, and could not believe what was happing [sic]. Washington stated "G" ordered Wiggins to reach back and hand him (Washington) the glasses. Washington stated that when Wiggins handed him the glasses he also started to struggle with "G." Washington stated that "G" then started shooting Wiggins. Washington stated that he got out of the vehicle and started running, while "G" continued to shoot. He stated he heard several shots as he was running. He stated that they were the only 3 people in the vehicle.

That Washington was shown a photo array and identified Michael Gaston [redacted] as "G", and as the person he saw shoot Wiggins. Washington also provided details that matched physical evidence, recovered video, and information that only an involved person would know. Washington further provided the location where he threw Wiggin's glasses as he was running away. Those glasses were later located by Sgt. McGeough and Det. Johnston where Washington stated they would be found. Washington provided this information in a written statement and the entire interview was audio and video recorded.

That Washington stated he had no knowledge of the intended robbery and stated that Gaston acted on his own, however, Washington admitted to running away with the victim's stolen sunglasses and acknowledged that he watched Gaston point a gun at Wiggins and order Wiggins to hand over his property. Washington was sitting in the back seat of the vehicle and could have exited the vehicle if he truly had no party in the robbery. Video also shows Washington and Gaston arrive at the convenience store, converse with Wiggins, and leave with Wiggins, together.

Opp'n Stmt. Ex. 2. The final paragraph of the warrant was new. The rest, with minor exceptions—the changed reference to Washington as an "involved person" instead of a "witness," and the reference to where the sunglasses were found— was simply copied verbatim from the Gaston warrant affidavit. *Compare* Opp'n Stmt. Ex. 1 *with* Ex. 2.

14

The warrant was issued, and Washington was arrested on September 6, 2016 after voluntarily turning himself in. Opp'n Stmt. at ¶ 67.

The affidavit made no mention of the following information, all of which was known to Defendants, *id.* at ¶ 103:

- Gaston and Washington were watching the NBA playoffs that night with others and had come to the store to purchase cigarettes and liquor, and to buy more marijuana. *Id.*

- Surveillance footage and Washington's testimony both indicate that upon exiting the store, Washington turned to walk home, rather than with Gaston, assuming Gaston had already gotten marijuana from Wiggins. *Id.* at ¶ 72.

- Washington had no idea Gaston had a gun until he pulled it out in the car, and that no gun is visible on Gaston's person at any point in surveillance video. *Id.* at ¶ 103.

- Gaston was waving the gun between Wiggins and Washington, and Washington was terrified he would be killed. *Id.*

- Gaston fired a warning shot before ordering Wiggins to give his belongings to Washington.

- The fact that Gaston was able to fire into the back seat of the car is corroborated by the gunshot hole in the rear driver's window. *Id.*

- Washington ran directly to Hartford Hospital following his escape from G and contacted the police to explain what he witnessed immediately after discharge. *Id.*

Although not in the arrest affidavit, Napolitano noted many of these facts in his Supplemental Case/Incident Report, including: that (1) Washington was so scared during the robbery he was unsure if Gaston shot Wiggins when he fired the warning shot; (2) Washington had no idea Gaston had a gun; and (3) Washington feared Gaston was going to kill him when Gaston returned to the apartment building after the shooting and requested Washington's help. *Id.* at ¶ 92. When

15

approving the warrant, McGeough did not verify that the affidavit contained all relevant information, inculpatory as well as exculpatory, nor did he request that Napolitano do so.[2] McGeough admitted that the fact that Washington was scared for his life and that Gaston was waving a gun between Washington and Wiggins is exculpatory evidence. *Id.* at ¶ 105. Both McGeough and Napolitano admitted that they knew a warrant must include exculpatory evidence and that the police must have probable cause to make arrests. *Id.* at ¶ 104.

### F. A Connecticut State Court Determines There Was No Probable Cause to Charge Washington with Felony Murder or Robbery.

On January 24, 2017, after a probable cause hearing under Conn. Gen. Stat. § 54-46a during which Washington represented himself, Connecticut Superior Court Judge Juliett Crawford found that *no probable cause* existed to charge Washington with robbery, and accordingly, felony murder. *Id.* at ¶ 68. Judge Crawford held, "After consideration of the state's evidence, with it's reliance on the accused's written statement, and the totality of the circumstances, the Court finds that the State failed to establish probable cause to require the defendant to be put on trial for the crime of Felony Murder as charged." *Id.* The court based its determination on a finding that the State had *not* established probable cause "that the accused, while acting with Michael Gaston, robbed Marshall Wiggins through the use of force." *Id.*[3]

---

[2] **Defendants repeatedly assert that State's Attorney Gail Hardy signed the Washington warrant, *e.g.*, Mot. at 23. This is false. Zagaja signed the warrant. *See* Opp'n Stmt. at ¶ 63.**
[3] **Judge Crawford was clear that probable cause for felony murder is necessarily predicated on probable cause for the underlying felony—here, robbery. *See***

G.      **Washington is Acquitted of Robbery and Conspiracy.**

Despite the conclusion that no probable cause existed, the State nonetheless went forward with the robbery and conspiracy charges against Washington. On July 10, 2017, after a bench trial before Connecticut Superior Court Judge Omar Williams, Washington was acquitted of both first-degree robbery and conspiracy to commit first-degree robbery. *Id.* at ¶ 69. Napolitano testified during this trial, and admitted no relevant information was discovered between May 17, 2016, when Washington came to the police, and August 31, 2016, when he drafted the warrant for Washington's arrest. *Id.* at ¶ 111.

In finding Washington not guilty of both charges, Judge Williams stated, "Mr. Washington, I BELIEVE YOU," emphasizing that Washington had done the right thing and provided a significant public service in reporting what he knew about a violent crime. *Id.* at ¶ 114. At the time of his acquittal, Washington had been incarcerated for nearly a year. *Id.* ¶ 67 (September 6, 2016 – July 10, 2017).

II.   **ARGUMENT**

A.      **Standard for Summary Judgment.**

Summary judgment is appropriate only when the pleadings and discovery show that there is no genuine issue as to any material fact. *S/N Precision Enter., Inc. v. AXSYS Tech., Inc.*, 279 F. App'x 80, 82 (2d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

Opp'n Stmt. Ex. 17, p. 7. ("The issue is whether there is probable cause to believe the accused, while acting with Michael Gaston, committed a robbery.").

248 (1986).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All inferences must be drawn in the light most favorable to the party opposing summary judgment. *Tolan v. Cotton,* 134 S. Ct. 1861, 1868 (2014). Summary judgment must be denied "[i]f, in this generous light, a material issue is found to exist." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d. Cir. 1985) (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Finally, "in doubtful cases, summary judgment is inappropriate." *Reese v. Garcia*, 115 F. Supp. 2d 284, 293 (D. Conn. 2000).

**B.   Defendants are Collaterally Estopped from Relitigating Probable Cause.**

As a threshold matter, the probable cause determination in Washington's criminal case—namely, that there was no probable cause for robbery and, consequently, felony murder—precludes Defendants from re-litigating the issue here.

Although Connecticut courts have yet to address this precise issue, other state and federal courts have held that a preliminary hearing determination regarding probable cause "may, in some situations, preclude … relitigating the issue of probable cause to arrest in a subsequent civil suit." *McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1147 (1999) (citing *Haupt v. Dillard*, 17 F.3d 285, 290 (9th Cir. 1994)). These courts have held that when the issue determined at the

probable cause hearing is the same as the issue of probable cause for arrest, collateral estoppel applies.

Such is the case here: The probable cause standards for arrest and for a preliminary hearing under Conn. Gen. Stat. § 54-46a are identical. "[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal citations omitted); *Harasz v. Katz*, 327 F. Supp. 3d 418, 448 (D. Conn. 2018). Similarly, the standard under § 54-46a is "whether the state's evidence would warrant a person of reasonable caution to believe the defendant committed the crime charged." *State v. Newson*, 238 Conn. 588 (1996).

These standards could hypothetically be distinct where the evidence available is different at the time of arrest than at the time of a preliminary hearing. *See Haupt*, 17 F.3d at 289 (explaining that "[t]his difference *may* be significant in some cases"). That distinction does not exist here. Like in *Haupt*, "no evidence [was] adduced at [the] preliminary hearing that was not available to the defendant officers when they obtained his arrest warrant." *Id.* Indeed, Napolitano admitted at the probable cause hearing that he had done *no additional investigation of any kind* after Washington gave his statement in late May—let alone after he drafted the arrest warrant affidavit in late August. *See* Opp'n Stmt. at ¶ 111. Accordingly, the information before Judge Crawford at the probable cause hearing was the

19

same as that available to Napolitano when he drafted the warrant.

Here, as in *Haupt*, collateral estoppel on the issue of probable cause is thus appropriate because "the issue determined at his preliminary hearing is identical to the issue whether there was probable cause to arrest him; both involved a determination that the evidence available and known to the officers at the time of his arrest supported a reasonable belief that [Washington] committed the offenses charged." *Haupt*, 17 F.3d at 289. Judge Crawford has already held that there was no probable cause to believe Washington had committed either robbery or felony murder. Defendants should not get a second (or really third, counting Washington's criminal trial) bite at the apple. Fairness and well-established finality principles require a finding that Defendants are collaterally estopped from arguing probable cause to arrest Washington.[4]

C.    In the Alternative, the Washington Arrest Affidavit Omitted Material Information Relevant to Probable Cause, Making Summary Judgment Improper.

Except for an unsupported and conclusory final paragraph, the Washington

---

[4] New York courts have not followed this line of caselaw on the premise that, under New York law, there is not privity between state and city actors. *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d. Cir. 2007). Counsel are not aware of a decision applying Connecticut law on this point. Washington's position is that Connecticut courts would apply collateral estoppel here, as usual collateral estoppel principles find that closely associated parties are considered in privity. *See, e.g., Mazziotti v. Allstate Ins. Co.*, 240 Conn. 799, 813 n.12 (1997) ("[T]he concept of privity has moved away from the conventional and narrowly defined meaning of mutual or successive relationships to the same rights or property. It now signifies a relationship between one who is a party of record and another who is a nonparty, but is sufficiently close to mandate the application of res judicata or collateral estoppel."). Considering the interplay and close working relationship between the police department and prosecutor's office in law enforcement tasks, and their aligned interests in ensuring arrests are made with probable cause, the Court should find them in privity and follow *Haupt*.

arrest affidavit is essentially identical to Gaston arrest affidavit. *Compare* Opp'n Stmt. at Ex. 1. *with* Ex. 2; *see also id.* at ¶ 115. It is notable for what it does *not* include: significant context that bears on Washington's culpability. It is incontrovertible that Defendants were aware of all this information at the time. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir. 1996) (court must consider facts available to officer at time of arrest).

As Defendants acknowledged, an officer making a probable-cause determination cannot ignore evidence tending to exculpate the suspect. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). But Napolitano and McGeough did just that. These critical omissions, most prominently that Washington did not know Gaston had a gun (and the state offered no contrary evidence), as well as that Gaston was pointing his gun at Washington in the car, undermine the suggestion that Washington was a willing participant or co-conspirator in Gaston's robbery attempt. Put another way, these missing facts "vitiate[] the finding of probable cause had they been included in the arrest warrant affidavit," *Reese*, 115 F. Supp. 2d at 293, making summary judgment inappropriate.

1.     The Applicable Standard.

While Defendants correctly point out that probable cause is presumed when an arrest is made pursuant to a warrant issued by a neutral magistrate, this presumption is not an "insurmountable burden." *See Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991). A plaintiff may overcome it "by demonstrating that his right not to be arrested without probable cause was violated when the officer submitting the probable cause affidavit 'knowingly or

intentionally, or with reckless disregard for the truth, made a false statement in

his affidavit, *or omitted material information*, and that such false information was

necessary to the finding of probable cause.'" *Id.* Material information is

"information … relevant to a given question in light of the controlling substantive

law." *Id.* at 871*.* "While the law does not demand that an officer applying for a

warrant volunteer every fact that arguably cuts against the existence of probable

cause, he must not omit circumstances that are critical to its evaluation."

*McColley v. Cty. Of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (quoting *Walczyk*,

496 F.3d at 161) (internal quotation marks omitted).

If an officer omitted material information, the court moves on to the second

step: "'look[ing] to the hypothetical contents of a 'corrected' application to

determine whether a proper warrant application, based on existing facts known to

the applicant, would still have been sufficient to support arguable probable cause

to make the arrest as a matter of law.'" *McColley*, 740 F.3d at 823 (citing *Escalera*

*v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "In performing the 'corrected affidavit'

analysis, [the court must] examine all of the information the officers possessed

when they applied for the arrest warrant." *Id.* They must also evaluate the totality

of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238 (1983).

"The materiality of a misrepresentation or an omission in this context is a

mixed question of law and fact.  The legal component depends on whether the

information is relevant to the probable cause determination under controlling

substantive law.  But the weight that a neutral magistrate would likely have given

such information is a question for the finder of fact, so that summary judgment is

inappropriate in doubtful cases." *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994) (citations omitted); *see also Ham v. Greene*, No. CV 91032275S, 1997 WL 255274, at *2 (Conn. Super. Ct. May 8, 1997), *aff'd*, 248 Conn. 508 (1999).

      2.     **There Are Multiple Material Omissions in the Warrant Affidavit.**

As described above, the Court must first examine the warrant itself, and the omissions made by Napolitano and McGeough.[5] The Court must then consider whether these omissions are relevant to a probable cause determination for first-degree robbery, conspiracy to commit first-degree robbery, and felony murder. If they are, what weight would be given to them cannot be decided on summary judgment—that is a question for the factfinder at trial.

Under Connecticut law, first-degree robbery requires that an individual (1) seriously injure a non-participant in the crime, (2) be armed with a deadly weapon, (3) use or threaten to use a dangerous instrument, or (4) threaten to use or display what he represents to be a firearm. Conn. Gen. Stat. § 53a-134. Meanwhile, conspiracy requires that a person intend to bring about the specific offense "which is the object of the conspiracy." *State v. Beccia*, 199 Conn. 1, 3-4 (1986); *see also State v. Pond*, 138 Conn. App. 228, 233–34 (2012), *aff'd*, 315 Conn. 451 (2015) (holding that Conn. Gen. Stat. § 53a–48(a) requires both intent to agree and the "specific intent to bring about *all* of the elements of the conspired

---

[5] Defendants spend significant time contending that Washington's failure to identify every omission at his deposition is some kind of admission that probable cause existed. Mem. at 20. This argument, made without citation to legal authority, makes no sense. If correct, it would encourage "gotcha" litigation in which a plaintiff's ability to adequately and exhaustively articulate his or her claim in a deposition trumps the factual record. In the end, all that matters here is what Napolitano and McGeough knew but omitted from the warrant.

offense, even those that do not by themselves carry a specific intent [requirement].") (emphasis in original). To participate in a conspiracy to commit first-degree robbery with Gaston, Washington not only would have had to form an agreement with Gaston, but also would have had to intend to commit the elements of first-degree robbery. He would have had to have an "understanding" that force—a "deadly weapon" or "dangerous instrument"—would be used or threatened to be used by Gaston in the act of robbery. *State v. Louis*, 163 Conn. App. 55, 73 (2016). More fundamentally, he would have had to have been a willing participant in Gaston's crimes. Napolitano had no facts suggesting this to be the case.

### 3. The Warrant Omits that Washington Did Not Know Gaston Had a Gun.

First, Washington told Defendants, repeatedly, that he did not know Gaston had a gun until Gaston pulled it out in the car. *See* Opp'n Stmt. at ¶ 102 (citing, *e.g.*, Washington Videotaped Interview at 20:57:45 ("I swear he never mentioned nothing about no robbery, or guns, nothing.") and Ex. 15 at p. 3). In fact, he "would not have opened the door" for Gaston that night if he knew. *Id.* at ¶ 116.[6]

Defendants produced no contrary evidence indicating Washington knew or should have known of Gaston's gun—or, indeed, of any indication Gaston would use "force or physical force." No witness testified, for example, that a gun was

---

[6] In his deposition, Washington went into significant detail regarding his surprise that Gaston had a gun, and the fact that, in subsequent viewings of the surveillance video from the convenience store, no gun is visible on Gaston's person. *See* Ex. 5 at 49:4-49:20. While Washington's deposition testimony is largely irrelevant in determining whether Defendants failed to include in the warrant relevant information they knew in 2016, this testimony is consistent with Washington's statements to the police before his arrest.

visible on Gaston's person in any surveillance footage (and it is not). Nor did Defendants interview anyone in Washington's apartment that night to ask about a gun, or anything else. Opp'n Stmt. Ex. 6 at 67:10-19 (never spoke to Black). Gaston himself provided no indication that Washington was aware of a gun. *See* Opp'n Stmt. Exs. 19 and 20. Washington also voluntarily took a gunshot residue test and passed. *Id.* at ¶ 37.

Napolitano was aware of these facts but omitted them from the warrant affidavit. Under Connecticut law, this omission affects probable cause for conspiracy to commit first-degree robbery. "The display or threatened use of a weapon is quintessential criminal conduct… .  Either a conspirator intends that his associates will display a purported weapon during the planned robbery, or he does not. There is no middle ground." *State v. Pond*, 315 Conn. 451, 464 (2015). In *Pond*, the Connecticut Supreme Court emphasized that "because conspiracy is defined in terms of the specific object offense," it "would make no sense to subject a person to conviction for conspiring to commit crimes that he neither planned nor agreed to commit." *Id.* at 1092. Accordingly, it affirmed the reversal of a conviction for conspiracy to commit second-degree robbery because the state "needed to prove," but did not, "an agreement to display a deadly weapon or dangerous instrument and that the defendant had the specific intent that such a weapon or instrument would be displayed."

Because Washington's lack of awareness of a weapon bears on the probable cause finding, his repeated, sworn statements that he had no knowledge of a gun should have been before the magistrate. *See State v.*

25

*Haywood*, 109 Conn. App. 460, 473 (2008) (overturning conviction because defendant needed to have prior knowledge of the presence of a gun in order to be convicted of conspiracy to commit robbery in the first degree). As the *Haywood* court explained,

> First, the defendant contended that he was not part of the robbery, that he just happened to be present when it happened. Thus, the defendant contested the charge of conspiracy, including the use of a deadly weapon. Although Moriarty testified that the defendant had a gun, Cunningham had not seen the defendant with a gun. There was not overwhelming evidence that the defendant had prior knowledge of or conspired to use a deadly weapon.

*Id.* at 94–95l.

There can be no conspiracy unless "co-conspirators understood a deadly weapon would be carried by one of the participants," and had "an understanding that force would be used to force someone to give up property." *Louis*, 163 Conn. App. at 73. As a result, Washington's knowledge or lack thereof regarding Gaston's possession of a gun is fundamental to evaluating probable cause for conspiracy to commit first-degree robbery. *Pond,* 315 Conn. at 466 (conspiracy to commit second-degree robbery requires intent that the robbery would involve the display or threatened use of deadly weapon or dangerous instrument).

Defendants conducted no additional investigation regarding what Gaston had done earlier that evening, including whether anyone who was with him had seen a gun, or any other evidence that he had conspired with Washington. *See* Opp'n Stmt. at ¶ 111. Failure to make an inquiry into this exculpatory evidence voids probable cause for an arrest. *See Martel v. Town of S. Windsor*, 562 F. Supp. 2d 353, 358 (D. Conn. 2008) ("In seeking an arrest warrant, a police officer may not purposely withhold or ignore exculpatory evidence that, if taken into

account, would void probable cause … A failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause.") (internal quotation marks and citations omitted) *aff'd*, 345 Fed. Appx. 663 (2d Cir. 2009); *see also Marchand v. Hartman et al.,* No. 3:17-cv-00116-MPS, Doc. No. 57 (D. Conn. June 5, 2019) (similar).

       4.     The Warrant Affidavit Omits that Washington Was At Gunpoint.

      From the start, Washington explained to Napolitano that Gaston had him (Washington) at gunpoint when he demanded that Washington take receipt of Wiggins's belongings from Wiggin. Opp'n Stmt. at ¶ 22 (citing Ex. 22 at 20:58:54). In his initial voluntary interview with police, Washington stated that Gaston "was pointing the gun at me when he told me to take the glasses." *Id.*  His initial written statement similarly stated: "G pointed the [gun] at me and order him to give me the glasses and rings." *Id.* (citing Ex. 3 p. 4).  Like any person in that situation, Washington explained that he was "scared for my life" and he "wasn't going to say no to 'G' when he had his gun out"; instead, he was going to do whatever Gaston wanted. *Id.* (citing Ex. 22 at 21:04:03). Washington has never wavered on this point. *See id.* (citing Ex. 24; Ex. 17, p. 4); Ex. 5 at pp. 43-45.

      Napolitano admitted repeatedly that Washington told him Gaston was waving a gun in Washington's face. Opp'n Stmt. at ¶ 109 (citing Washington Criminal Trial Tr., July 7, 2017, Ex. 11, at pp. 19:26 – 21:5) Ex. 6 at p. 73:16-18). He also admitted that he did not include this information in his affidavit. *Id.* (citing Napolitano Tr. at pp. 98-99). Instead, the warrant misleadingly suggests that Washington approved of what was occurring by saying that Washington

"watched Gaston point a gun *at Wiggins* and order Wiggins to hand over his property" (emphasis added). Opp'n Stmt. Ex. 2 at p. 2. This omission is a material fact that undermines probable cause.

What's more, Napolitano's probable cause rationalization relies on the assertion that "Washington was sitting in the back seat of the vehicle and could have exited the vehicle if he truly had no part in the robbery." Opp'n Stmt. Ex. 2 at p. 4. A magistrate could easily find that, if Gaston were pointing a gun at Washington, he could not, in fact, have exited the vehicle at any time.[7] In fact, McGeough agrees. He stated that Napolitano never told him that, according to Washington, Gaston was pointing a gun at Washington. Opp'n Stmt. Ex. 8 at pp. 72-73. McGeough also stated that he would consider this fact, along with Washington's statement that Washington was afraid he would be killed, to be both "exculpatory" and "relevant" evidence. Opp'n Stmt. at ¶ 105 (citing Ex. 8 at pp. 106-107).

In determining whether the necessary quantum of evidence existed to support a finding of probable cause, the Court is required to evaluate the totality of the circumstances. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("Courts should look to the totality of the circumstances and must be aware that probable causes a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."). In that regard, a neutral magistrate could easily find the fact that

---

[7] As described *infra* at p. 37, "[m]ere presence at the scene of the crime, even when coupled with knowledge of the crime, is insufficient to establish guilt of a conspiracy." *State v. Stellato*, 10 Conn. App. 447, 454 (1987).

Washington was at gunpoint and afraid for his life during the events in question relevant to a probable cause finding. This is because, for conspiracy, "what is important is whether the defendant *willfully participated in the activities of the conspiracy* with knowledge of its illegal ends." *State v. Davis*, 68 Conn. App. 794, 798–800 (2002); *see also Pond*, 315 Conn. at 476 (explaining that the crime of robbery requires "an individual *willingly* participate[ ] in a robbery or attempted robbery," and that "one of the perpetrators *actually* threatens the use of deadly force … ." (first emphasis added; second in original)). It is simply not credible that a "willing" participant in a conspiracy would need to be forced to take part at gunpoint.

In fact, Napolitano went one step beyond omitting a material fact. He drafted the affidavit in such a way that it misrepresents the facts. Specifically, the warrant states that Washington "acknowledged that he watched Gaston point a gun at Wiggins and order Wiggins to hand over his property." Opp'n Stmt. Ex. 2 at p. 4. This statement insinuates that Washington had agreed to the robbery because he simply sat back and watched Gaston hold Wiggins at gunpoint. *Cf. State v. Louis*, 163 Conn. App. at 68 (concluding that there is sufficient evidence to support finding that defendant agreed to commit robbery when video showed him watching co-conspirator hold store clerk at gunpoint). This highly incomplete account defies everything Washington, whom Napolitano repeatedly called a "very credible" witness, told Napolitano about the crime. Without this key circumstance, a neutral magistrate would not have all material facts necessary to a probable cause determination.

5.     **The Warrant Omits that Gaston Had Already Fired the Gun Before Pointing It at Washington.**

During Washington's interview with Napolitano, he carefully explained the timing of the events in the car. In particular, he stated that *before demanding that Washington take Wiggins's glasses*, Gaston had shown himself unafraid to use his gun—by firing a shot in the car. Opp'n Stmt. ¶¶ 21, 102 (citing video testimony at 20:58:54-21:00 (describing sequence of events and explaining warning shot came first); Ex. 3 at p. 4 ("Then G said, OH I'm buggin or something like that and fired the gun one time. The victim said 'Yo chill the "G" pointed the [gun] at me and order him to give him his glasses and rings.") Ex. 15 at p. 2; ("Washington stated that 'G' again ordered the large male to hand over the glasses and fired a shot.").

The fact that Gaston not only had a gun, but also was pointing it at Washington after having fired it, bears on the requisite totality-of-the-circumstances evaluation of probable cause. *Gates,* 462 U.S. at 238. Once again, McGeough agreed that this information would be "relevant." Opp'n Stmt. at ¶ 105. Yet because Napolitano omitted this fact from the warrant affidavit, it was not before the magistrate.

6.     **The Warrant Omits that Washington—at McGeough's Suggestion—Had Been Placed in Witness Protection Due to His Fear of Gaston.**

Washington stated throughout his interview that he feared Gaston would kill him. When McGeough asked Washington if he felt safe, Washington responded that he did not. McGeough then took Washington to a hotel, put him in a room under McGeough's name, and paid using a personal credit card. Opp'n

Stmt. at ¶ 43. The next day, he brought Washington to the chief state's attorney's office to be placed in witness protection. *Id.* ¶ 44. By the time Defendants wrote the warrant affidavit, Washington had been in witness protection for months. *Id.* at ¶ 47.

The fact that the state saw fit to place Washington in witness protection for months is relevant to Washington's fear of Gaston, and bears on Defendants' assessment of his credibility and consequent probable cause determination. Witness protection is rarely used. *See* Opp'n Stmt. Ex. 6 at p. 71:16-25.  It defies logic to assert that the police would actively help someone whom they believed likely to have committed first-degree robbery and felony murder get into witness protection, and then just let him hang out all summer without follow-up. *See id.* at 79:19-20 (noting Napolitano never checked on Washington while in witness protection). At the same time, Defendants omitted this information from the warrant. Zagaja, for example, did not know Washington was in witness protection. Opp'n Stmt. Ex. 9 at pp. 61: 8-15. He only found out after Washington was arrested. *Id.*

Napolitano, at his deposition, tried to justify this incongruity. He testified that Washington was placed in witness protection to keep track of him—i.e., as a substitute for arrest. Ex. 6 at p. 71 ("A: I don't recall the specifics but I recall why we weren't arresting him. Q: And why weren't you arresting him? A: Because he was being placed in witness protection."). Both Zagaja and McGeough quickly dismissed this response: They testified that witness protection is never used to keep track of witnesses, to detain them, or as a substitute for arrest. Opp'n Stmt.

at ¶¶ 112-13.

>        7.      **The Warrant Affidavit Omits Additional Context Undermining Probable Cause.**

In the warrant affidavit, Napolitano noted that Washington was "scared" and told Gaston "that he wanted no part in this." Opp'n Stmt. Ex. 2. Aside from these bare-bones statements, however, he omitted any context that contradicts Washington's involvement in the events in question, and, consequently, undermines probable cause.

For example, Napolitano omitted the fact that:

- **Surveillance footage from the Quick Stop shows Washington walking away from Gaston and back in the direction he came from—i.e., toward his apartment. Opp'n Stmt. at ¶ 72 (citing, *inter alia*, Ex. 25, Store Surveillance Footage Outside View, Camera Number One from May 17, 2016, at 11:17:02 (Washington heads down sidewalk in direction Washington and Gaston came from)). Washington is then called over by Gaston, who stated he hadn't yet bought the marijuana and that Wiggins would give them a ride. *Id.* The warrant does not reflect this; instead, it misleadingly suggests that "Video also shows Washington and Gaston … leave with Wiggins, together." Ex. 2. at p. 4. At the very least, whether Washington began to head home after leaving the Quick Stop is a disputed issue of material fact.[8]**

- **Plaintiff repeatedly mentioned his shock, terror, and fear at the events in the car. *See* Opp'n Stmt. at ¶ 103. As noted *supra*, McGeough testified that statements regarding Mr. Washington's fear for his life would be "relevant" in authoring a warrant affidavit. *Id.* at ¶ 105.**

- **Gaston tried to get Washington alone after the murder, but Washington was able to concoct a ruse and flee. *Id.* at ¶ 86-88.**

- **After witnessing the murder, Plaintiff was so traumatized that he sought**

---

[8] Defendants argue, unconvincingly, that this point is negated by the warrant's note that Washington "eventually got into Wiggins vehicle." Mem. at 21. This argument warrants little response. It defies common sense that a magistrate could conclude from this phrasing that Washington was trying to walk away from the Quick Stop until Gaston stopped him. In any event, it is for the jury to decide that this explanation is nonsense.

treatment at Hartford Hospital. *Id.* at ¶ 90. Napolitano was aware of this—in fact, at the time of his interview, Washington was still wearing his hospital bracelet. *Id.* at ¶ 92. Napolitano also had Washington sign a waiver for his hospital records. Washington Criminal Trial Tr., July 7, 2017, at 23:8-14.

These circumstances are further examples of facts left out of the arrest affidavit.

> 8.    The Multiple Material Omissions in the Warrant Application Create a Genuine Factual Issue as to the Existence of Probable Cause.

Napolitano selectively included information in order to suggest that Washington was acting in concert with Gaston. He selectively omitted all the information at his disposal suggesting that Washington was a bystander. When an officer omits information relevant to a probable cause determination, the Court must "look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *McColley*, 740 F.3d at 823 (internal citation omitted).

As described *supra*, at minimum, a corrected affidavit would have referenced:

- Washington's statements that Gaston was waving the gun at Washington during the events in question;

- Washington's statement that he did not know Gaston had a gun, and that there was no evidence (including videotape) showing that Gaston had a gun;

- Washington's statements that Gaston had already fired the gun, along with corroborating evidence such as the gunshot through the rear passenger seat window;

- The fact that Washington had spent three months in the state's

witness protection program, and that his placement there had been facilitated by the EHPD;

- The fact that video surveillance showed that, after leaving the convenience store, Washington turned to go home rather than toward Wiggins's car;

- The fact that Washington believed Gaston was planning on killing him, causing Washington to flee his own apartment; and

- The fact that Washington was treated at Hartford Hospital.

All of this information is "relevant to a given question in light of the controlling substantive law"—that is, whether a reasonable person would believe Washington had committed first-degree robbery, conspiracy to commit first-degree robbery, and/or felony murder. Under a totality of circumstances review, these omissions could easily affect a magistrate's determination. Put another way, it is far from clear that this omitted information "could not possibly have affected the [Judge's] decision to issue the warrant," *Velardi,* 40 F.3d at 574—which is the *only* context in which summary judgment is proper.

*McColley* is instructive. In that case, the officer drafting the warrant omitted information indicating that the inhabitant of a suspected drug house was unconnected to various members of a drug ring. 740 F.3d at 823. The Second Circuit reversed the district court's finding that there was probable cause to arrest, explaining that this omitted contextual information could have influenced the magistrate's understanding of the circumstances and thus decision to issue an arrest warrant. *Id.* As the Second Circuit explained, "[i]ncluding McColley's identity in the affidavit and attendant lack of connection to Stink, Sport, Bruce, and their drug trade—either explicitly or implicitly by not describing any such

34

history or connection—could indeed have altered an issuing magistrate's assessment of the totality of the circumstances with respect to the CI's information about 396 First Street." *Id.* at 825. Here, similarly, knowing that Washington—whom Napolitano had already deemed a "credible witness"—had stated that he himself was at gunpoint during the events in question; that he had no idea Mr. Gaston had a gun; and that Mr. Gaston had already fired the gun (among other things) could have altered a magistrate's view of the situation.

As in *McColley*, then, summary judgment is inappropriate: "The exact weight that the judge would have given this information remains a question of fact" for determination by the factfinder. *Id.* (citing *Velardi*, 40 F.3d at 574); *see also Ham v. Greene*, 1997 WL 255274, at *2 (Conn. Super. Ct. May 8, 1997), *aff'd*, 248 Conn. 508 (1999) ("The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law …The factual component requires an inference as to whether the information would likely be given weight by a person considering the question."). A genuine issue of material fact exists as to how a judge would have weighed this information, and whether the judge would have issued the arrest warrant based upon a "corrected" affidavit.

### 9.   Defendants' Post-Hoc Rationalizations Are Missing from the Warrant and, Regardless, Do Not Support Probable Cause.

Defendants offer several post-hoc rationalizations for probable cause that do not appear in the warrant. *E.g.*, Mot. at 21-22. These have no relevance to the inquiry before this Court, i.e., whether Napolitano omitted material information relevant to the probable cause determination. *Golino*, 950 F.2d at 871. Regardless,

these suggestions do not support probable cause.

Some of them are plainly counterfactual. First, Defendants suggest that Zagaja weighed a number of considerations *unknown to him at the time*, by his own testimony, to determine that there was probable cause for arrest, and then discuss it with Defendants. *See* Mem. at 17 (detailing Zajaga's purported knowledge). This suggestion is false. Zagaja was very clear in his deposition that when he spoke with Defendants about arresting Washington, the single piece of information he had about the events in question was Gaston's arrest warrant. *See* Opp'n Stmt. Ex. 9 at 58:17-19 ("I said, 'please review Michael Gaston's warrant,'" which is the only thing in existence at that point in time.[]); 59:14-16 ("Q: So the only thing you reviewed was— A: The affidavit. Q: -- the affidavit for Michael Gaston? A: Correct"). And Gaston's arrest warrant mentions none of the information cited by Defendants. *See* Ex. 1. That document does not mention that Washington left the car with sunglasses. It does not mention that Washington threw the sunglasses on the ground. It does not mention that Washington took off his sweatshirt. And it does not mention that Mr. Washington claimed he was being held at gunpoint. Because the arrest warrant for Mr. Gaston was the single piece of information Zagaja said he had, and because that document mentions none of this "evidence," it would be impossible for Zagaja to have discussed it with Napolitano (who, regardless, does not recollect this conversation).

Defendants also argue that Napolitano, after the supposed conversation with Zagaja that Napolitano does not recall, "reviewed the file and agreed with Attorney Zagaja's interpretation" regarding probable cause. Mem. at 17 n.5. Once

again, not only is there conflicting evidence that any such conversation took place, but there is no evidence that Napolitano "reviewed" the file and "agreed" with any particular assessment of probable cause. Napolitano did not testify as such, and Defendants have not offered any evidence to support this assertion.

Second, Defendants suggest a hodge-podge of additional rationalizations, including that: (1) "[Washington] was with Gaston for an extended period of time before the murder," (2) "he agreed to get in the car with Wiggins"; (3) Gaston followed him after the murder; and (4) Washington took steps to get rid of clothes after fleeing Gaston. Mot. at 22. None of these four pieces of "evidence" appears in the warrant affidavit.

First, the warrant affidavit simply states that: "Video also shows Washington and Gaston arrive at the convenience store, converse with Wiggins and leave with Wiggins, together." It leaves the timing ambiguous. It entirely leaves out the context; i.e., how Washington and Gaston were watching an NBA playoffs game that evening with a number of people and went to the store at halftime. Moreover, the fact that they agreed to leave the store together makes entire sense—Washington thought Wiggins was going to sell marijuana to Gaston, which was one of the reasons they went to the Quick Stop. This fact pattern plainly does not support probable cause for conspiracy to commit robbery. It is axiomatic that "[m]ere presence at the scene of the crime, even when coupled with knowledge of the crime, is insufficient to establish guilt of a conspiracy." *State v. Stellato*, 10 Conn. App. 447, 454 (1987); *see also Dufort v. City of New York,* 874 F.3d 338, 350 (2d Cir. 2017) ("Police do not have

particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime."); *Perez v. Duran*, 962 F. Supp. 2d 533, 538 (S.D.N.Y. 2013) ("Physical proximity to criminal behavior without more is insufficient to establish probable cause."). Despite Defendants' efforts to play up Washington's casual acquaintance with Gaston, Connecticut law is clear that facts such as "the defendant's association with [a perpetrator] and the fact that the defendant was present at a meeting called by [that person] … do not amount to criminal activity or to an agreement to engage in criminal activity followed by an overt act in furtherance of the conspiracy." *State v. Lynch*, 21 Conn. App. 386 (1990).

Next, the fact that Gaston came to Washington's apartment in a potential effort to harm Washington after the murder does not indicate agreement. Opp'n Stmt. at ¶¶ 28-29. Washington has always told the police that he thought Gaston was planning on killing him and that he had to trick Gaston to get away from him. *Id.* Washington specifically asked Napolitano to review surveillance tape of the apartment building in order to corroborate what had transpired after the murder, but Napolitano did not even request the footage. *Id.* at ¶ 108 (citing Ex. 11, Washington Criminal Trial Tr., July 7, 2017, at pp. 16:23-17:11).

Third, it is not surprising that the warrant affidavit makes no mention of the fact that Washington took off his shirt after fleeing the car because, after seeing Gaston murder someone, he was (understandably) terrified that he was next. *See* Opp'n Stmt. at ¶ 29.

Defendants also argue, for the first time, that the fact that Washington and

Gaston were "in a joint venture to buy drugs" somehow creates probable cause. *See, e.g.*, Mot. at 19 (arguing that desire to buy drugs justifies probable cause for all three charges). This post-hoc rationalization is not included in the warrant affidavit, which mentions only that *Gaston* intended to buy marijuana. *See* Ex. 1. at p. 3. Regardless, Defendants provide no law to support the proposition. Nor could they.

A police officer has probable cause to arrest a suspect when he or she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing *a crime*." *Marchand v. Simonson*, 16 F. Supp. 3d 97, 110 (D. Conn. 2014) (internal citations omitted) (emphasis added); *see also* Conn. Gen. Stat. § 53a-48(a) (conspiracy requires intent "that conduct constituting a crime be performed," and agreeing to "engage in or cause the performance of" criminal conduct). But in Connecticut, possession of a small amount[9] of marijuana is not a crime. *United States v. Mazza*, 503 F. App'x 9, 11 (2d Cir. 2012); *see also State v. Menditto*, 110 A.3d 410, 417-18 (Conn. 2015) (possession of less than one-half ounce of marijuana is a minor civil violation rather than a crime). Per Conn. Gen. Stat. § 21a-279a(a), someone found to possess less than one-half an ounce of a "cannabis-type substance" shall be issued a summons and then fined. *Menditto*, 110 A.3d at 418. A violation of § 21a-279a(a) is a "non-criminal state-level offense." *United States*

---

[9] Napolitano had information at his disposal indicating that Washington wanted to buy an eighth of marijuana; the amounts found on Mr. Wiggins and in his car were much smaller than that. Opp'n Stmt. at ¶ 73.

*v. Peters*, No. 3:18-CR-188 (VAB), 2019 WL 351261, at *5 (D. Conn. Jan. 29, 2019). Because there is no crime of conspiracy to possess a small amount of marijuana, Defendants' argument that they had probable cause to arrest Plaintiff based on his accompanying Gaston to buy marijuana must fail.

Finally, Napolitano and McGeough both testified that they did not believe Washington could have been a gunpoint because Washington was seated in the back seat of the car, and that this justified Washington's arrest. Mem. at 17 n.5. Again, this justification appears nowhere in the EHPD's files or the warrant affidavit. Moreover, EHPD photos of Wiggins's car show both that there was significant space between the front seats, as well as that the front passenger seat was in a reclining position, allowing access to the backseat. Opp'n Stmt. Ex. 13. Based on the conflicting testimony and this photograph, whether Gaston could have pointed a gun at both Washington and Wiggins is an issue for the jury.

In short, Defendants' post-hoc, ad-hoc rationalizations for probable cause are too little, too late. Some of them are counterfactual; they are mainly absent from the warrant itself, and they do not, as a matter of law, support a probable cause finding. Thus, summary judgment is not appropriate because Defendants fall far short of demonstrating that probable cause existed.

D.  **Because Factual Questions Remain as to the Validity of the Warrant, a Question Also Remains as to Whether Defendants Are Eligible for Qualified Immunity.**

Qualified immunity shields an official from liability for civil damages where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate

such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d. Cir. 2007) (internal quotation marks and citations omitted). "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino*, 950 F.2d at 870; *see also Jennings v. City of Bridgeport*, No. 3:16-CV-117 (MPS), 2018 WL 950115, at *11 (D. Conn. Feb. 20, 2018) (no qualified immunity because, on the plaintiffs' version of facts, they were arrested without probable cause, and arrest without probable cause violated clearly established right); *Hartman,* No. 3:17-cv-00116-MPS, Doc. No. 57 (D. Conn. June 5, 2019) (no qualified immunity because "[c]learly established law at the time of the stop prohibited a traffic stop absent reasonable suspicion or probable cause"). All Defendants admitted that they were aware of this right. Ex. 6 at 19:4-7 (Napolitano); Ex. 8 at 32:14-17 (McGeough); Ex. 7 at 13:2-4 (Ortiz).

Defendants maintain that even if probable cause was lacking, they are nevertheless entitled to qualified immunity because a reasonable police officer in their shoes *could* have reasonably believed that probable cause existed. Mem. at 29. "That is incorrect." *McKnight v. Vasile*, No. 11-CV-6328P, 2017 WL 1176051, at *20 (W.D.N.Y. Mar. 30, 2017) (no qualified immunity).

"Arguable probable cause must not be misunderstood to mean 'almost probable cause.'" *Jenkins*, 478 F.3d at 87. "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of the arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.*

Rather, the relevant inquiry is "whether it was objectively reasonable for

the officer to conclude that probable cause existed." *Id.* Here, the disputed facts

bear on just that question. Accordingly, "[t]he same disputed facts that prevent

defendants from establishing probable cause also doom their qualified immunity

defense at this stage." *Bryant v. Serebrenik*, No. 15CV3762ARRCLP, 2016 WL

6426372, at *5 (E.D.N.Y. Oct. 28, 2016); *see also Rasin v. City of New York*, No.

14CV5771ARRCLP, 2016 WL 2596038, at *8 (E.D.N.Y. May 4, 2016) ("Here, a

determination of "arguable probable cause" turns on the same factual disputes

that make it inappropriate for me to grant summary judgment based upon a

determination of probable cause. In such circumstances … a court should not

grant summary judgment on qualified immunity grounds.")*; Hulett v. City of

Syracuse*, 253 F. Supp. 3d 462, 495 (N.D.N.Y. 2017) ("These factual uncertainties

also preclude the grant of qualified immunity at this juncture.")

     When unresolved material factual issues remain, including how much

weight a magistrate would have awarded the omitted, relevant facts, and whether

a magistrate would have issued a warrant based upon an affidavit that included

all relevant facts, summary judgment on qualified immunity grounds is

inappropriate. *See Curry* v. *City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003);

*Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) (noting that qualified

immunity presents a "mixed question of law and fact," and "[a]lthough a

conclusion ... as a matter of law may be appropriate where there is no dispute as

to the material historical facts, if there is such a dispute, the factual question

must be resolved by the factfinder" (internal quotation marks omitted)); *see also

McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999) ("Where ... there are facts in

dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate."); *accord Simon v. City of New York*, No. 14 Civ. 8391, 2017 WL 57860, at *4 (S.D.N.Y. Jan. 5, 2017).

*Reese* presents a similar scenario. In that case, the court analyzed a number of items omitted from an arrest warrant and concluded that some of them were relevant to probable cause. *Reese v. Garcia*, 115 F. Supp. 2d 284, 296 (D. Conn. 2000). Because these presented factual issues as to what weight a magistrate would accord them, and whether he or she would still find probable cause based on a corrected affidavit, the court not only denied summary judgment, but also rejected the defendants' immunity defense. It reasoned: "Likewise, we find that there are genuine issues of material fact as to whether any reasonable officer would believe that there was probable cause for plaintiff's arrest once the omitted information is added to the affidavit and all facts are viewed in the light most favorable to the plaintiff." *Id.*

Defendants, similarly, fall short of demonstrating an entitlement to qualified immunity as a matter of law.

### E.   For a Malicious Prosecution Claim, Plaintiff Does Not Need to Prove Malice Above and Beyond Lack of Probable Cause.

Defendants argue that Washington's malicious prosecution claim must fail, *see* Mem. at 23-24, because the facts preclude him from arguing that Defendants "acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Holman v. Cascio*, 390 F. Supp. 2d 120, 122 (D. Conn. 2005). However, Plaintiff need not make a separate showing of malice because "[m]alice may be inferred from lack of probable cause." *Falls Church Grp., Ltd. v. Tyler, Cooper &*

*Alcorn, LLP*, 281 Conn. 84, 94 (2007); *see also Mulligan v. Rioux*, 229 Conn. 716, 746 (1994) (recognizing that the "[w]ant of probable cause and malice, combined are essential. If the evidence supports the former, we need not consider the latter, since it may be inferred.") (quotations omitted). Accordingly, if Defendants lacked probable cause to arrest Washington, they necessarily acted with the requisite malice to sustain a malicious prosecution claim, and the court need not make a separate determination. *See, e.g., Troland v. Whitehead*, No. 3:12CV822 AVC, 2013 WL 1136720, at *4 (D. Conn. Mar. 18, 2013) (no need to show malice where the court determined that warrant affidavit did not constitute probable cause).

At the same time, evidence suggests that Defendants did act "for a purpose other than that of bringing an offender to justice." For example, McGeough testified that Zagaja told him he wanted Washington arrested because otherwise it would seem like Washington was "being given preferential treatment." Ex. 8 at 97:18-24. Zagaja also testified to a discussion along these lines:

> Q: If Lieutenant McGeough were to testify that he bumped into you one time in Part A and had a discussion with you about the charging decisions in this case, and that you said to him words to the [e]ffect that you thought Mr. Washington needed to be charged because otherwise it would look like he got a break, would that ring a bell?"
> A: Yes.

Ex. 9 at 102:18-25; *see also* Ex. 8 at 95:1-2 (testifying that he was worried that the failure to arrest Washington "made me look bad").

Napolitano, for his part, said that Washington was not arrested on May 17 "[b]ecause he was being placed in witness protection," an explanation the other

defendants quickly dismissed. Zagaja depo at 49; McGeough depo at 53-54.[10] At the same time, Napolitano did not deny that he may have told Mr. Washington, after arresting him, that the arrest warrant was "bogus" and that "the prosecutors had him by the balls." 102:25-103:10. There is also evidence that Washington threatened to stop cooperating with the police in Gaston's prosecution, giving Defendants a motive to want to punish him.

It is facially implausible to believe that the police would let Washington be out on the streets to do as he pleased for over three months if they truly believed Washington had been involved in the robbery and murder. This sudden about-face, coupled with the fact that no further investigation had occurred, suggests that Washington's arrest was for some ulterior motive and raises an issue of fact for the jury.

F.    Defendants Are Not Shielded By Prosecutorial Immunity.

Defendants are not entitled to absolute prosecutorial immunity[11] for preparing an arrest warrant for Plaintiff, even assuming they did so after consulting with Zagaja. Defs.' Mem. at 32.

---

[10] Defendants also argue that there is not substantial evidence they knew about Washington's call to GA-12 threatening not to testify at Gaston's trial. Mem. at 24. Defendant Napolitano did, however, recall a phone call from Washington over the summer. Ex. 8 at 77:20-78:18. He could not describe what it was about. *Id.* Ortiz also testified that he knew about the call to the courthouse because Napolitano told him about it *before* Washington was arrested. Opp'n Stmt. at ¶ 58.

[11] Prosecutors are not always entitled to absolute immunity. "[W]hether a [prosecutor] is or is not entitled to absolute immunity for his or her conduct depends on the function being performed at that time." *Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995). A prosecutor has absolute immunity for "acts … associated with [the prosecutor's] function as an advocate." *Id.* at 661 (citing *Dory II*, 25 F.3d at 83)). But a prosecutor has only qualified immunity for acts associated with the prosecutor's function as a criminal investigator. *Id.* at 656.

First, Defendants are wrong on the law. Defendants characterize a prosecutor's act of asking police to prepare an arrest warrant as an act "undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur[s] in the course of his role as an advocate for the State," entitling him to absolute prosecutorial immunity. *Dory II*, 25 F.3d 81, 83 (2d Cir. 1994); *see also* Opp. at 32 ("Similarly here, Detective Napolitano and Sergeant McGeough carried out an activity intimately associated with the judicial phase of the criminal process."). This characterization has been squarely rejected by the Supreme Court. To the contrary, a prosecutor's provision of legal advice to the police regarding the existence of probable cause to arrest is an investigatory function warranting only qualified immunity. *Burns v. Reed*, 500 U.S. 478, 493 (1991) (holding that a prosecutor is *not* entitled to absolute immunity for advising the police about whether they have probable cause to make an arrest). As the *Burns* court reasoned, the suggestion that telling police they have probable cause "is related to a prosecutor's role in screening cases for prosecution and in safe-guarding the fairness of the criminal judicial process proves too much, since almost any action by a prosecutor could be said to be in some way related to the ultimate decision whether to prosecute." *Id.* at 480. Prosecutorial immunity simply does not extend to all "out-of-court activities that occur prior to the initiation of a prosecution." *Id.* at 495. Because Zagaja is not entitled to absolute immunity for opining on probable cause in the first place, Defendants do not get absolute immunity derivatively.

Second, the present case is readily distinguishable from *O'Neal*, which

Defendants cite. *See* Mem. at 32. There, the Second Circuit extended absolute prosecutorial immunity to a detective who—in preparation for trial—visited a victim's apartment "to ascertain specific information relevant to anticipated testimony" (namely, whether passers-by could be seen from a window). *O'Neal v. Morales*, 679 F. App'x 16, 18 (2d Cir. 2017). The *O'Neal* court determined that the act "was in furtherance of the advocacy function of preparing for judicial proceedings" because of its proximity to trial. *See id.* (the detective "investigated what could be seen from the victim's apartment *only* because the ADA requested that he do so shortly before trial, and *only* to obtain a specific piece of information relevant to anticipated trial testimony") (emphases added). Defendants have not cited, and Plaintiff has not identified, any case where a prosecutor asked police to fill out an arrest warrant application, and the court subsequently extended derivative prosecutorial immunity to that officer.[12] The U.S. Supreme Court has held that police officers applying for arrest warrants are entitled to, at most, qualified immunity. *Malley*, 475 U.S. at 343. To extend absolute prosecutorial immunity to Defendants for supposedly consulting with Zagaja before preparing the warrant would undermine the Supreme Court's judgment that "the qualified immunity defense … provides ample protection to all

---

[12] *Buckley*, also cited by Defendants, *see* Mem. at 31-32, only reinforces the distinction between a police officer's role in assessing probable cause (for which he is entitled, at most, to qualified immunity) and a prosecutor's role. "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand… . When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273-76 (1993).

but the plainly incompetent or those who knowingly violate the law." *Id.* at 341.

Finally, as a factual matter, it is unclear what, if any, conversations took place between Zagaja and Defendants. Defendants gave divergent testimony as who spoke to whom, the timing, and the content of any conversations. Given the lack of clarity regarding what, if anything, transpired, summary judgment is inappropriate even if Defendants were right about the law, which they are not.[13]

## CONCLUSION

Discovery has not made clear why Defendants tried to arrest Washington, a witness to a murder, months after he voluntarily came forward to report it, and months after they used his "prudent and credible" testimony to arrest the murderer. At the same time, issues of fact remain as to whether a magistrate would have issued an arrest warrant if properly presented with all the facts bearing on probable cause. How much weight a magistrate would give these facts cannot be determined at this juncture—and consequently, neither can qualified immunity, especially when Defendants fail to provide any justification for arresting an innocent man three months after placing him in witness protection and without conducting any additional investigation. The Court should deny Defendants' motion for summary judgment.

---

[13] **Defendants also cite testimonial immunity. That immunity may protect Napolitano and Ortiz "only in so far" as their act of providing testimony at the probable cause hearing and Washington's trial; it does not extend to any other aspect of the malicious prosecution claim.** *Cooper v. City of New York*, **2018 WL 5115565, at \*11 (E.D.N.Y. Oct. 11, 2018) (denying summary judgment in malicious prosecution case).**

Respectfully submitted,

LAURENCE WASHINGTON

BY:  */s/ John M. Doroghazi*
John M. Doroghazi (ct28033)
Elana S. Bildner (ctt03079)
WIGGIN AND DANA LLP
265 Church Street, P.O. Box 1832
New Haven, CT 06508-1832
Tel: (203) 498-4400
Fax: 203-782-2889
jdoroghazi@wiggin.com
ebildner@wiggin.com

*Pro Bono Counsel for Plaintiff*