**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LAURENCE WASHINGTON, | : | |
| | : | |
| Plaintiff, | : | No. 3:17-CV-1316 (VLB) |
| | : | |
| v. | : | |
| | : | January 10, 2020 |
| JUDGE DEWEY ET AL, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [DKT. 46]

Plaintiff Laurence Washington ("Washington") asserts Fourth Amendment claims for false arrest and malicious prosecution against East Hartford Police Department ("EHPD") Detective Frank Napolitano ("Napolitano"), EHPD Detective Daniel Ortiz ("Ortiz"), and EHPD Sergeant Francis McGeough ("McGeough") (collectively, "Defendants"). [Dkt. 61].

Before this Court is Defendants' Motion for Summary Judgment. [Dkt. 71-1]. Washington opposed the motion. [Dkt. 76]. Defendants replied. [Dkt. 78]. For the following reasons, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

## I.    Factual Background[1]

### A. Marshall Wiggins' Murder[2]

Washington's claim arises from a murder he witnessed and his arrest and prosecution for his alleged role in the murder.

Upon returning to his apartment on May 16, 2016, Washington and a friend, "Black," listened to music, watched basketball, drank alcohol, and smoked marijuana. [Dkt. 71-6 at 2]. A little while later, Michael Gaston ("Gaston") knocked on Washington's door and asked Washington if he wanted to smoke together. *Ibid*. Washington had recently met Gaston and knew him only as "G," a short drug dealer around town. [Dkt. 76-16 at 3].  Washington invited him in, and the three continued to smoke, drink and watch the basketball game. [Dkt. 71-6 at 2]. At half-time, they ran out of marijuana, and Gaston said he would go out and buy some more. *Ibid*; [Dkt. 76-1 at ¶13]; [Dkt. 76-23 at 20:36:00-20:36:40].

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements at [Dkts. 71-2 (Defs.' 56(a)(1) Statement) and 76-1 (Washington's 56(a)(2) Statement)] and attached exhibits submitted in support of and in opposition to Defendants' Motion for Summary Judgment.

[2] The key factual question presented by the instant motion for summary judgment is whether the Defendants had probable cause or arguable probable cause to arrest Washington. Determination of probable cause is limited to "the facts known by the arresting officer at the time of the arrest." *E.g.*, *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). Therefore, the Court limits the facts in this subsection to those undisputedly known by EHPD at the time of Washington's arrest: those provided by Washington in his May 17, 2016 oral statement [Dkt. 76-23 (Ex. 22, Videotape: Washington Witness Interview from May 17, 2016)];  those provided by Washington in his May 17, 2016 voluntary written statement [Dkt. 71-6 (Ex. C)], those in the EHPD May 17, 2016 Case/Incident Report [Dkt. 76-13 (Ex. 12)] and those in the EHPD May 18, 2016 Case/Incident Report [Dkt. 76-16 (Ex. 15)].

Washington decided to walk with Gaston to a convenience store about a mile from his apartment because he needed cigarettes and soda. [Dkt. 71-6 at 2; Dkt. 76-16 at 3].

Once they arrived at the store, Gaston and a very large man later identified as Wiggins went to the back of the store and talked. [Dkt. 71-6 at 2]. Washington assumed Gaston was buying marijuana. [Dkt. 76-16 at 3]. Meanwhile, Washington bought several items and spoke with people in the store. [Dkt. 71-6 at 2-3].

After Gaston and Wiggins returned to the front of the store, the three went outside. *Id.* at 3. Washington turned and began to walk toward his apartment. *Ibid.* Upon exiting the store, Gaston called him over to Wiggins' car. *Ibid.* Gaston let Washington know that Wiggins did not have enough marijuana on him, and that they would have to go with Wiggins to his house to get the amount Gaston wanted. [Dkt 76-23 at 20:53:00-20:53:30]. Gaston asked Wiggins if Washington could come along for the ride, and Wiggins said he didn't care. [Dkt. 71-6 at 3].

Gaston got in the front passenger seat and Washington got in the back-passenger seat. *Ibid.* Washington felt nauseous from the combination of the heat in the car, the alcohol he had previously drank, and the marijuana he had previously smoked. *Ibid.* He closed his eyes and rested while Gaston and Wiggins talked. *Id.* at 3-4.

The car came to a stop, and Washington opened his eyes to see Gaston pointing a gun at Wiggins. *Id.* at 4. Washington had had no idea Gaston was

carrying a gun. [Dkt. 76-16 at 4]. Washington told Gaston he was crazy for doing this. *Ibid.*; [Dkt. 71-6 at 4].

Gaston told Wiggins to give Gaston his rings and glasses. *Ibid.* When Wiggins did not obey, Gaston fired a shot. *Ibid.* Gaston then pointed the gun at Washington, gesturing to Wiggins to give Washington his glasses and rings. *Ibid.* Wiggins dropped his glasses into Washington's hand and simultaneously reached for the gun. *Ibid.*

As Wiggins and Gaston started to fight, a shot was fired, and Washington jumped out of the car and ran. *Id.* at 5-6. When he reached a back street, he realized he was still gripping the glasses in his hand and threw them on the ground. *Id.* at 6. He also threw his sweatshirt into a dumpster. *Ibid.* He walked home. *Ibid.*

When Washington reached his apartment, he found Black and told him what happened. *Ibid.* Within minutes, Gaston arrived at Washington's apartment. *Ibid.* Gaston told Washington that he needed Washington's help to retrieve the murder weapon. *Id.* at 6-7. Washington thought Gaston was lying, and that Gaston was trying to get Washington somewhere less conspicuous so Gaston could kill Washington. [Dkt. 76-16 at 4]. Washington lied to Gaston to get away from him, and then fled out of the building and down four flights of stairs to Hartford Hospital. [Dkt. 71-6 at 8]. He felt suicidal and stayed overnight at the hospital. *Ibid.*

### B. Washington's Report to the Police

Washington was discharged from Hartford Hospital the next day. [Dkt. 71-2 at ¶32]. His daughter's mother, Elizabeth Reyes ("Reyes"), picked him up. *Ibid.* Washington told Reyes what he had seen, and she called the EHPD. *Id.* at ¶ 33.

4

Washington reported that he had information on the murder, and the police arranged for Washington to provide a sworn statement at the police station. *Id.* at ¶¶34-36.

At the station, Washington gave a voluntary interview and provided a written statement to Napolitano, the lead detective on the case. *Id.* at ¶¶37-38. Washington volunteered to submit to a gun residue kit and identified Gaston in a photo array. *Id.* at ¶37.

It is undisputed that at the end of the interview, McGeough entered the room and asked Washington if he felt safe. [Dkt. 76-6 (Washington Dep.) at 69]. Washington said he did not because Gaston knew where he lived. *Ibid.* McGeough let Washington know that Washington could be placed into Witness Protection. *Ibid.* That night, it was too late to organize Witness Protection through the State's Attorney's office. [Dkt. 71-2 at ¶ 43]. Defendants took Washington to a hotel, booked him a room, and paid for his stay. *Id.* at ¶ 44.

The next day, they drove Washington to Hartford to be formally placed in Witness Protection. *Id.* at ¶44. Washington signed a Witness Protection Agreement, where he remained until his arrest in September 2016. *Id.* at ¶46.

### C. Additional Investigation and Gaston's Arrest, Interview, and Trial

Before interviewing Washington, Ortiz retrieved the store surveillance footage and entered it into evidence. [Dkt. 76-13 at 2]; [Dkt. 76-16 at 2]. The defendants had also inspected the scene. [Dkt. 76-15 (Ex. 14)].

On May 19, 2016, Napolitano drafted an arrest warrant application and affidavit for Gaston, seeking to charge Gaston with murder, felony murder, robbery

in the first degree, criminal possession of a pistol/firearm, and carrying a pistol/revolver without a permit. *Id.* at ¶49. The arrest warrant affidavit for Gaston relied on information provided by Washington and represented that Washington was "prudent" and "credible." [Dkt. 76-1 at ¶95]. Gaston was arrested. [Dkt. 71-2 at ¶ 51].

On June 7, 2016, Napolitano interviewed Gaston. [Dkt. 76-1 at ¶93]. In the interview, Gaston lied repeatedly. *Ibid.* Gaston denied knowing who Washington was. *Ibid.*

Two years later, on June 6, 2018, after a trial at which Washington testified, the jury found Gaston guilty of murder, felony murder, and robbery in the first degree. [Dkt. 71-2 at ¶53]. Though he was charged with conspiracy, the jury did not convict him and acquitted Gaston of conspiracy to rob Wiggins. *Ibid.*

D. *Napolitano and McGeough's Arrest of Washington*

On August 31, 2016, Napolitano drafted an arrest warrant application for Washington, in consultation with McGeough. [Dkt. 71-2 at ¶ 61; Dkt. 76-3 (Ex. 2, Application for Arrest Warrant for Laurence Washington)]. The application, asserting there was probable cause to believe that at a minimum Washington conspired with Gaston to rob Wiggins, sought to charge Washington with three separate crimes: felony murder of Wiggins, in violation of Conn. Gen. Stat § 53a-54c; first degree robbery of Wiggins violation of Conn. Gen. Stat. § 53a-134; and conspiracy with Gaston to commit first degree robbery of Wiggins, in violation of Conn. Gen. Stat. §§ 53a-48 and 53a-134. [Dkt. 71-2 at ¶61].

The affidavit accompanying Washington's arrest warrant application largely repeated the affidavit accompanying Gaston's arrest warrant application. *Compare* [Dkt. 76-3] with [Dkt. 76-2]. The only other information police had obtained after Washington's May 16 statement was Gaston's statement, which they did not find credible. [Dkt. 76-1 at ¶¶ 61, 99].

As submitted, the affidavit accompanying Washington's arrest warrant application stated the following:

> That on 5/7/16 I interviewed Washington at EHPD. Washington stated that he was with "G", walking to the convenience store on Main St. He said he had only recently met "G" a few weeks ago. He said, once inside the store "G" started talking to a very large black male. Wiggins is 6'8 and 350 pounds. He stated he had never met the male, but that "G" was trying to buy some "weed" from Wiggins. Washington stated he and "G" went outside and eventually got into Wiggins vehicle. Washington stated "G" got into the front passenger seat and he got into the back passenger seat. Washington stated that after doing a U-turn they drove south on Main St. for short distance before turning left onto a street that he is unfamiliar with. Washington stated that Wiggins then stopped the vehicle in a driveway. Washington stated that when the vehicle stopped, "G" pulled out a black revolver with his right hand and pointed it at Wiggins, ordering Wiggins to give him his glasses and jewelry.

> That Washington stated he started yelling at "G" that he was crazy and that he wanted no part in this. Washington stated that he was scared, and could not believe what was happing [sic]. Washington stated "G" ordered Wiggins to reach back and hand him (Washington) the glasses. Washington stated that when Wiggins handed him the glasses he also started to struggle with "G." Washington stated that "G" then started shooting Wiggins. Washington stated that he got out of the vehicle and started running, while "G" continued to shoot. He stated he heard several shots as he was running. He stated that they were the only 3 people in the vehicle.

> That Washington was shown a photo array and identified Michael Gaston [redacted] as "G", and as the person he saw shoot Wiggins. Washington also provided details that matched physical evidence, recovered video, and information that only an involved person would know. Washington further provided the location where

he threw Wiggin's glasses as he was running away. Those glasses were later located by Sgt. McGeough and Det. Johnston where Washington stated they would be found. Washington provided this information in a written statement and the entire interview was audio and video recorded.

That Washington stated he had no knowledge of the intended robbery and stated that Gaston acted on his own, however, Washington admitted to running away with the victim's stolen sunglasses and acknowledged that he watched Gaston point a gun at Wiggins and order Wiggins to hand over his property. Washington was sitting in the back seat of the vehicle and could have exited the vehicle if he truly had no part in the robbery. Video also shows Washington and Gaston arrive at the convenience store, converse with Wiggins, and leave with Wiggins, together.

[Dkt. 76-3.] The affidavit made no mention of the following witness statements, all of which were known to the Defendants:

- Washington told police that Gaston and Washington were watching the NBA playoffs that night with Black and had come to the store to purchase cigarettes and liquor, and to buy more marijuana. [Dkt. 76-1 at ¶103].

- Washington told the police that, upon exiting the store, Washington turned to walk home. [Dkt. 76-1 at ¶¶ 72, 102].

- Washington told the police he had no idea that Gaston was going to rob Wiggins, and also did not know that Gaston had a gun until he pulled it out in the car. *Id.* at ¶ 103.

- Washington told the police that Gaston fired a warning shot before ordering Wiggins to give his belongings to Washington. *Ibid.; see* [Dkt. 76-15 (photograph showing bullet hole in the rear window].

- Washington told the police that, after he said he wanted nothing to do with an armed robbery, Gaston pointed his gun at Washington, gesturing for Wiggins to give Washington his belongings. [Dkt. 76-1 at ¶103].

- Washington told the police that he did not realize that he was holding Wiggins' glasses when he left the car. *Ibid.*

- Washington repeatedly told Napolitano and McGeough that he was scared for his life. *Ibid.*

- Washington told police that when Gaston came to Washington's apartment to try and get him to assist, Washington refused and ran to Hartford Hospital. *Ibid.*

- Washington ultimately spent three months in the state witness protection program. *Ibid.*

Napolitano submitted the warrant application to G.A. 14 in Hartford, where it was reviewed and signed by State's Attorney David Zagaja and by Superior Court Judge Julia Dewey. [Dkt. 76-1 ¶63.] After the warrant issued, Napolitano spoke with Washington over the phone and asked him to turn himself in. [Dkt. 71-2 at ¶64]. Washington asked if he could turn himself in the next day, since it was Labor Day and he wanted to enjoy the holiday. *Id.* at ¶65. Napolitano agreed, and Washington turned himself in the next day, on September 6, 2016. *Id.* at ¶67.

In January 2017, Judge Crawford dismissed the felony murder charge against Washington on the basis that there was no probable cause. *Id.* at ¶68.[3] In July 2017, after a bench trial, Judge Williams acquitted Washington of the remaining charges of robbery and conspiracy to commit robbery. *Id.* at ¶ 69. Washington had been in jail for almost a year.

## II.   Relevant Procedural History

On July 26, 2017, Washington filed an initial complaint *pro se* directed at Judge Julia Dewey ("Dewey"), State's Attorney David Zagaja ("Zagaja"), the EHPD, Napolitano, Ortiz, and McGeough. [Dkt. 1]. In its Initial Review Order, the Court dismissed all claims against Dewey, Zagaja, and McGeough. [Dkt. 9 at 3-8, 11; Dkt.

---

[3] While Judge Crawford stated that "[t]he issue is whether there is probable cause to believe the accused, while acting with Michael Gaston, committed a robbery," her ultimate holding only went to felony murder: "the Court finds that the State failed to establish probable cause to require the defendant to be put on trial for the crime of Felony Murder as charged." [Dkt. 76-18 (Ex. 17: Jan. 24, 2017 Memo. of Dec.) at 8-9].

11]. The Court also dismissed the Fifth and Sixth Amendment claims against Napolitano and Ortiz. [Dkt. 9 at 8-11; Dkt. 11].

On April 19, 2018, the Court appointed Attorney John Doroghazi as pro bono counsel for Washington. [Dkt. 25]. On April 30, 2019, the Court granted in part and denied in part Washington's motion to amend, and on May 1, 2019, Washington filed an amended complaint in in which he asserted Fourth Amendment claims for false arrest and malicious prosecution against Napolitano, Ortiz, and McGeough. [Dkts. 60, 61]. On May 30, 2019, the Defendants filed the motion for summary judgment currently before the Court. [Dkt. 71]. Washington responded, [Dkt. 76], and the Defendants replied. [Dkt. 78].

III.   <u>Legal Standard</u>

Summary judgment should be granted "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Ibid.*

 "In ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151

(2000); *see Welch-Rubin v. Sandals Corp.,* No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences form the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Line, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal citation and quotation omitted). Only where there is no evidence upon which a jury could properly render a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, may summary judgment lie.

IV. <u>Abandoned Claim</u>

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F. Supp. 2d 197, 206 (D. Conn. 2008) (internal quotation marks omitted); *see also Olschafskie v. Town of Enfield*, No. 15-CV-67, 2017 WL 4286374, at *11 n.8 (D. Conn. Sept. 27, 2017). Defendants moved for summary judgment on the entire Complaint and argued that Ortiz should be dismissed as a party defendant. In his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Washington does not oppose Defendants' argument that Detective Ortiz should be

dismissed as a party defendant. Dkt. 71 at 24-25. Therefore, the Court considers Washington's claims against Ortiz abandoned, and dismisses them.

## V. Analysis

Section 1983 provides that:

> any person who, acting under color of law, 'subjects or causes to be subjected, any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws' of the United States shall be liable to the injured party in actions at law.'

*Shattuck v. Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002) (quoting 42 U.S.C. § 1983). Washington alleges violations of his Fourth Amendment constitutional rights under two theories: (1) false arrest and imprisonment and (2) malicious prosecution. [Dkt. 61].

### A. *Probable Cause*

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. A plaintiff seeking to recover for false arrest under 42 U.S.C. §1983 must establish that "(1) the defendant intentionally arrested him or had him arrested, (2) the plaintiff was aware of the arrest, (3) there was no consent to the arrest, and (4) the arrest was not supported by probable cause." *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 246 (D. Conn. 2003). The only element that Defendants contest is the fourth: they argue that they had probable cause. [Dkt. 71-1 at 13-23].

Defendants also argue probable cause as a defense on the malicious prosecution claim. To prevail on a §1983 claim for malicious prosecution, a plaintiff

must show "a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests under the Fourth Amendment," as well as that "criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor. *Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018).

"[T]he existence of probable cause is a complete defense to a claim alleging false arrest or malicious prosecution." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 449 (D. Conn. 2002); *see also Fernandez-Bravo v. Town of Manchester*, 711 F. App'x 5, 7 (2d Cir. 2017) (Summary Order ("There can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff," even where affidavit supporting arrest warrant omitted information. "The same conclusion obtains as to malicious prosecution.")).

### 1. Estoppel

Washington argues that the Defendants are collaterally estopped from litigating probable cause because the matter was already decided in Washington's criminal case. At the probable cause hearing, Judge Crawford found there was no probable cause to charge Washington with felony murder. [Dkt. 76-1 at 19-21]; [Dkt. 76-18 at 7-9]; *see McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1147 (1999) (noting that a preliminary hearing determination "may, in some situations, preclude… relitigating the issue of probable cause to arrest in a subsequent civil suit.)

The Court is persuaded by Defendants' argument that collateral estoppel does not apply because Defendants were not in privity with the State's Attorney

who argued at the probable cause hearing and did not have the opportunity to litigate. [Dkt. 78 at 7-10.] "Whenever collateral estoppel is asserted, but especially in those cases where there is a lack of mutuality or the doctrine of privity is raised, the court must make certain that there was a full and fair opportunity to litigate." *Aetna Cas. & Sur. Co. v. Jones*, 220 Conn. 285, 306, 596 A.2d 414, 425 (1991). The role of the prosecutor prosecuting a criminal case is not to protect the interests or defend the actions of the investigating or arresting officers. The prosecution is of a state statute, and the prosecutor's client is the state not the investigating and arresting officers. While the police department and the prosecutor's office have a cooperative working relationship in law enforcement tasks, it is not "sufficiently close" to establish privity. *Mazziotti v. Allstate Ins. Co.*, 240 Conn. 799, 813 n.12 (1997); *see Walczyk v. Rio*, 496 F.3d 139, 150 n. 13 (2d Cir. 2007) (collecting cases that declined to hold police officers bound in their individual capacities by determinations adverse to the state in prior criminal cases). Therefore, collateral estoppel does not apply, and Defendants may litigate probable cause.

### 2. Probable Cause Standard

In the Second Circuit and in Connecticut,

> "Probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."

*Zalaski v. City of Hartford*, 723 F.3d 382, 389-90 (2d Cir. 2013) (quoting *Walczyk*, 496 F.3d at 156). While this standard "requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties." *Walczyk*, 496 F.3d

at 156 (internal quotations and citation omitted). "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and practical men, not legal technicians, act." *Ibid.* Further, there is no constitutional violation if there is probable cause to arrest for *any* crime. *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

The probable cause inquiry is "based upon whether facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Walczyk*, 496 F.3d at 156 (quoting *Devenpeck v.* Alford, 543 U.S. 146, 152-53 (2004)). Officers are "not required to accept [a suspect's] account on faith," but are rather, "entitled to weigh her explanation… against the facts on the other side of the ledger." *Figueroa v. Mazza*, 825 F.3d 89, 102 (2d Cir. 2016)(citations omitted). But "[w]hether probable cause exists 'depends on the totality of the circumstances' of each case." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The totality of the circumstances includes any "plainly exculpatory evidence," which "an officer may not disregard." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). To have probable cause to arrest, officers must have probable cause to believe that a suspect had the requisite intent, though such cause "frequently depends on circumstantial evidence." *Zalaski*, 723 F.3d at 393; *see State v. Patterson*, 213 Conn. 708, 721 (1990).

Probable cause "is a mixed question of law and fact." *Ornelas v. United States*, 517 U.S. 690, 696 (1996), *cited by United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015). "Questions of historical fact regarding the officers' knowledge at

the time of arrest are to be resolved by the jury." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017). But "where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (citations omitted).

Where, as here, a plaintiff argues "that material omissions infected the magistrate's probable cause determinations," "[t]he materiality of these omissions presents a mixed question of law and fact." *Ibid.* (citations omitted). "Whether omitted information is relevant to the probable cause determination is [a] question of law." *Ibid.* (citations omitted). If it is relevant, "then questions of fact may arise as to what weight a neutral magistrate would likely have given such information, and whether defendants acted deliberately or recklessly in omitting the information from the arrest warrants." *Ibid.* (citations omitted). Finally, the existence of probable cause depends on the relevant substantive law.

Washington was arrested based on a finding that there was probable cause that he had committed first degree robbery, conspiracy to commit first degree robbery, and felony murder. In Connecticut, first-degree robbery occurs when, "in the course of committing a larceny," an individual "or another participant in the crime: (1) causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be… [a] firearm." Conn. Gen. Stat. §§ 53a-133 ("Robbery defined"); 53a-134 ("Robbery in the first degree"). Conspiracy requires both the

"intent to agree or conspire" and "the intent to commit the offense which is the object of the conspiracy." *State v. Beccia*, 199 Conn. 1, 3 (1986) (interpreting Conn. Gen. Stat. § 53a-48(a)); *see State Pond*, 138 Conn. App. 228, 233-34 (2012), *aff'd*, 315 Conn. 451 (2015). Finally, felony murder requires that an individual commit or attempt to commit a robbery, or one of a list of other specified crimes. Conn. Gen. Stat. § 53a-54c.

In general, "mere presence in a suspected car" does not support the inference of felony without more. *Compare United States v. Di Re*, 332 U.S. 581, 593 (1948) (holding there was no probable cause for conspiracy to possess counterfeit ration cards where plaintiff was in a car with two others in broad daylight, in a public street of a large city, and there were no obvious signs that a criminal act had occurred), *with Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (holding there was probable cause to believe plaintiff had possessed a controlled substance where plaintiff was in a car with two others, rolled-up cash and plastic bags of cocaine were accessible to all three men, and none of the men gave information about who owned the money or the cocaine).

3. *Analysis*

Here, Defendants argue that they had probable cause to arrest "Washington for conspiracy, and by extension, robbery in the first degree and felony murder." [Dkt. 71-1 at 15]. Washington challenges the existence of probable cause on the basis that the Defendants omitted relevant exculpatory information. *Id.* at 23-35. At this stage, the question for the Court is only whether the omitted information is "relevant." *See Walczyk*, 496 F. 3d at 158. Information is relevant if it tends to make

the existence of probable cause more or less likely than it would have been without the evidence. *See Panetta*, 460 F.3d at 395 (when determining probable cause, "[c]ourts should look to the totality of the circumstances").

Washington argues—and Defendants do not contest—that affidavit for Washington's arrest warrant omitted the following facts:

1. Washington reported to Napolitano and McGeough that he was not aware Gaston had a gun;

2. Washington reported to Napolitano and McGeough that Gaston was pointing a gun at Washington when he demanded that Washington take receipt of Wiggins' belongings from Wiggins.

3. Washington reported to Napolitano and McGeough that Gaston had fired a shot in the car before demanding that Washington take Wiggins' glasses

4. Washington, at McGeough's suggestion, had been placed in witness protection due to his fear of Gaston

5. Surveillance footage shows Washington initially walking towards his apartment and away from Gaston when he came out of the corner store.

6. Washington repeatedly mentioned his shock, terror, and fear for his life during the events in the car.

7. Washington believed that Gaston would try to murder him

8. After witnessing the murder, Washington sought treatment at Hartford Hospital, and was still wearing his hospital bracelet when he was interviewed by Napolitano.

[Dkt. 76-1 at ¶ 103].

The Court finds that these omissions are relevant and exculpatory.

First, the fact that Washington swore to Napolitano and McGeough that he was not aware that Gaston had a gun tends to make it less likely that Washington and Gaston had planned or agreed to commit robbery with a gun. This point in turn tends to make it less likely that Washington and Gaston had planned or agreed to commit first-degree robbery, both as a matter of logic and because Wiggins was a very large man, standing 6'8" and weighing 350 pounds, much bigger than either Washington or Gaston, so first-degree robbery without a gun would have likely been unsuccessful. [4]  Thus, the information is relevant.

Next, the evidence that Gaston fired his gun before pointing it at Wiggins and Washington, and demanding that Wiggins give his glasses and rings to Washington tends to make it more likely that Washington had not agreed with Gaston to rob Wiggins. The fact that Gaston fired his gun before gesturing toward

---

[4] Washington devotes several pages in his brief to arguing that if Washington was not aware that Gaston had a gun, he could *not possibly* have intended to commit first-degree robbery at all. [Dkt. 76 at 24-27]. This argument fails, however, because an individual may commit first-degree robbery by means other than being armed with a gun if one "(1) causes serious physical injury to any person who is not a participant in the crime;…; or (3) uses or threatens the use of a dangerous instrument… ; or (4)…threatens the use of a [firearm]." Conn. Gen. Stat. § 53a-134.  Unlike the defendants in the cases cited by Washington, Washington was not charged with a specific sub-section of the first-degree robbery statute. *Compare* [Dkt. 76-3 (Washington Arrest Warrant Application) at 4 (stating probable cause exists for first degree robbery, without specifying a sub-section) ], *with State v. Haywood,* 109 Conn. App. 460, 473, 952 A.2d 84, 92 (2008) (defendant charged with conspiracy to commit robbery in the first degree, specifically the subsection of the first degree robbery statue which requires "a deadly weapon")'; *State v. Louis,* 134 A.3d 648, 657 (Conn. App. 2016) (same).

Washington supports an innocent explanation, duress, for why Washington took Wiggins' glasses.

Washington's repeated statements of his shock and terror during the events in the car and his fear of Gaston, which were so convincing that he was placed in Witness Protection, all support Washington's statement that he was not aware that Gaston had a gun and did not expect him to fire it. They then also tend to make it less likely that Washington and Gaston had planned or agreed to commit first-degree robbery. Thus, these statements of shock and terror for his life were relevant.

Also, the fact that Gaston has to gesture to Washington to stop him from heading back towards his apartment,[5] in combination with the fact Gaston had earlier told Washington that he intended to buy marijuana at the store, supports Washington's claim that had not intended to accompany Gaston and only got into the car with Wiggins because Gaston asked Washington to join Gaston and Wiggins. Consequently, that fact is relevant to the question of whether Washington conspired with Gaston to rob Wiggins.

---

[5] In his 56(a)(2) statement, Washington states that "as Wiggins and Gaston finished their conversation in the store, Washington left the store and began to like walk back towards my apartment and that's when G stopped me." [Dkt. 76-1 at ¶72]. In their Reply, Defendants mention that "Gaston stopped plaintiff from walking home," and do not dispute Washington's statement. [Dkt. 78]. After reviewing the store footage of the time, the Court notes that Washington and Gaston appear to leave the store at the same time and that they are in step – while Gaston does gesture to Washington, there is no point when Washington clearly turns away from Gaston. [Dkt. 76-25 at 11:16:30-11:18:00].

Defendants argue that this evidence was not omitted because the affidavit supporting the arrest warrant application did note that Washington had only "eventually" gotten into Wiggins' car. [Dkt. 71-1 at 21] *citing* [Dkt. 71-5 at 3]. But Washington argues, and the Court agrees, that the information that Washington's claim that he intended to return home, and had to be gestured back by Gaston, has additional evidentiary value above the mere evidence of the delay. [Dkt. 76 at 32 n.8]

In further response, Defendants argue that Napolitano and McCullough had no obligation to give credence to self-serving or implausible statements. *Figueroa*, 825 F.3d at 102. For example, they argue that the claim that Gaston, in the front passenger seat, held both Wiggins and Washington at gunpoint at the same time is incredible given that Wiggins was in the driver's seat and Washington was in the back seat. [Dkt. 78 at 12 (citing Dkt. 71-11 (Napolitano Dep.) at 73)].

The Court is not persuaded by this argument for two reasons. First, some of the exculpatory statements were not, as characterized, simply uncorroborated self-serving statements. They were backed by evidence beyond Washington's own testimony. By the time Washington was arrested, the police had the corner store's security footage, which showed Gaston gesturing to Washington to come with him. [Dkt. 76-1 at ¶72]. They also had pictures of Wiggins' car, which had a bullet hole in the rear driver's side window, and in which Gaston's car seat was tilted back so that he could have faced both driver and back seat. [Dkt. 76-15 at 2]; [Dkt. 76-14 at 2]. The angle of Gaston's car seat also corroborated Washington's claim that he

was in easy firing range, positioned not directly behind Gaston, but rather diagonally in the back seat to his left.

Second, even if Napolitano and McGeough gave Washington's statements less weight, the statements deserved some weight. *Figueroa*, 825 F.3d at 102 ("That [the suspect] included [her statement] in a report to police doubtless lent it some credibility"). In deposition testimony, McGeough agreed that Washington's statements that Gaston was pointing a gun at Washington and that Washington was afraid he would be killed were "exculpatory" and "relevant." [Dkt. 76-9 (Ex. 8, McGeough Dep.) at 106].

Because some of the omitted information was relevant, questions of fact arise as to what weight a neutral magistrate would likely have given such information, and whether defendants acted deliberately or recklessly in omitting the information from the arrest warrants. Therefore, the Court does not grant the motion for summary judgment on this basis.

### B. Qualified Immunity

#### A. Law

Defendants next argue that the doctrine of qualified immunity entitles them to summary judgment. Qualified immunity shields a police officer from suits for damages under 42 U.S.C. § 1983 where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks and citations omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). "The right not to be arrested

or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F. 2d 864, 870 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992). Therefore, the question at hand is whether "it was objectively reasonable" for Napolitano and McGeough "to believe that [their] action[s] did not violate such law."

Where, as in this case, a neutral magistrate issues an arrest warrant, there is a "presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino*, 950 F.2d at 870; *see Mara v. Rilling*, 921 F.3d 48,73 (2d Cir. 2019) (same). "[A] plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Golino*, 950 F.2d at 870. "To urge otherwise, a plaintiff must show… that defendants misled a judicial officer into finding probable cause by knowingly or recklessly including material misstatements in, or omitting material information from, the warrant affidavits." *Mara*, 921 F.3d at 73; *see Golino*, 950 F.2d at 870. "Recklessness may be inferred where the omitted information was critical to the probable cause determination." *Golino*, 950 F.2d at 871.

To determine whether the information was material "[u]nder the [corrected affidavits] doctrine, [the Court] look[s] to the hypothetical contents of a "corrected" application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004). Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed,

or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa*, 825 F.3d at 100 (citations omitted).

Where, as here, a plaintiff argues that "material omissions infected the issuing magistrate's probable cause determination," "the materiality of these omissions presents a mixed question of fact and law." *Walczyk*, 496 F.3d at 157-58 (citing *Velardi v. Walsh*, 40 F.3d 539, 574 (2d Cir. 1994)). "The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases" *Velardi*, 40 F.3d at 574 (citing *Golino*, 950 F.2d at 871), *quoted* in *McColley*, 740 F.3d at 823. Where the omitted information goes to the "credibility" of a source with a motive to lie, such as information that does or does not corroborate the source's claims, arguable probable cause is a question of fact because there is a question about what conclusions a reasonable officer or judicial official would draw as to the source's credibility. *McColley*, 740 F.3d at 824-26 (Pooler, J.), *cited in Ganek v. Leibowitz*, 874 F.3d 73, 87 (2d Cir. 2017); *see Walczyk*, 496 F.3d at 163 (holding that whether a "reasonable officer" would have drawn the correct conclusion from a piece of evidence was a question of fact that precluded summary judgment on qualified immunity).

### B. Analysis

As discussed above, the Court finds that the omissions from the affidavit for Washington's arrest warrant application were relevant for finding arguable

probable cause that Washington conspired with Gaston to commit first degree robbery. Therefore, questions of fact arise as to the weight a neutral magistrate would have given such information.

Moreover, several of these omissions go to Washington's credibility: Washington's claim that he didn't know Gaston had a gun provides corroborating detail to his claim that he had not planned to rob Wiggins; the corner store outdoor surveillance footage supports his claim that he had not made any agreement to rob Wiggins; the bullet hole in the rear side window of the car supports his claim that he had accepted Wiggins' possession in fear of his own life; and the hospital bracelet and offer of witness protection support his claim that he was scared and disturbed by the events in the car. The omission of this information creates additional questions of fact about what conclusions a reasonable officer or judicial official would draw as to Washington's credibility. *McColley*, 740 F.3d at 824-26 (Pooler, J.).

Since there are questions of fact as to arguable probable cause, the Court does not grant summary judgment on the basis of qualified immunity.

### C. *Prosecutorial Immunity*

Defendants argue that they are entitled to absolute prosecutorial immunity. Prosecutors receive absolute immunity from suit under § 1983 when they engage in "advocacy conduct that is 'intimately associated with the judicial phase of the criminal process.'" *Giraldo v. Kessler,* 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Absolute immunity extends "[to] individual employees who assist such [prosecutor] and who act under that

[prosecutor's] direction in performing functions closely tied to the judicial process." *O'Neal v. Morales*, 679 F. App'x 16, 18 (2d Cir. 2017) (Summary Order), *cert. denied,* 138 S. Ct. 559 (2017) (quoting *Hill v. City of New York*, 45 F.3d 653 660 (2d Cir. 1995)).

But, as Washington points out, the facts in *O'Neal* are distant from the facts at hand. [Dkt. 76 at 46-47]. *O'Neal* concerned a detective whose involvement in the case only included visiting the victim's apartment two weeks before trial to confirm whether the faces of passerby could be seen from the window, a fact relevant to testimony that the victim and her mother would give. *O'Neal*, 679 F. App'x. The detective's actions assisted the prosecutor in his role as an advocate formulating his trial strategy. *Id.* In contrast, in the case at hand, the defendants are police at the first stage of investigation: applying for an arrest warrant, an action "further removed for the judicial phase of criminal proceedings." *Malley v. Briggs,* 475 U.S. 335, 343 (1986) (holding that police officers applying for arrest warrants may be entitled to qualified immunity but are not entitled to absolute immunity). In further contrast to *O'Neal*, in the case at hand, defendant police Napolitano and McGeough had much more information than prosecutor Zagaja: to the extent that prosecutor Zagaja directed Napolitano and McGeough to draft the arrest warrant application, he did so only on the basis of the limited information in the affidavit from Michael Gaston's arrest. [Dkt. 76-10 (Ex. 9, Zagaja Depo.) at 71, 73].

Therefore, the Court does not extend prosecutorial immunity to Napolitano and McGeough.

### D.  *Testimonial Immunity*

Defendants also argue that, "to the extent that plaintiff's claims rely on the testimony of the defendants at his or Gaston's criminal trial, such claims are barred by absolute testimonial immunity." [Dkt. 71-1 at 31] (citing *Forrester v. White*, 484 U.S. 219, 227 (1988)). However, since Washington's claims do not rely on such testimony, this immunity does not preclude any of Washington's claims.

### E. *Malice*

As discussed, to prevail on a § 1983 claim for malicious prosecution, a plaintiff must show that "a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests under the Fourth Amendment," as well as that "criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor. *Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018). Here, there is no disagreement that Defendants arrested and prosecuted Washington, and that the criminal proceedings ended in his favor when he was acquitted. Defendants challenge the probable cause prong, a challenge the Court has already addressed. Defendants also challenge the malice requirement.

In Connecticut, "[a] party may demonstrate malice by showing that a prosecution was undertaken "from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff," including initiating proceedings without probable cause." *Turner v. Boyle*, 116 F. Supp. 3d 58, 85 (D. Conn. 2015) (quoting *Pinsky v. Duncan,* 79 F.3d 306, 313 (2d Cir. 1996)). Therefore, since there is a question of fact as to whether Defendants lacked probable cause to arrest Washington, there is also a question of fact as to whether they acted with malice,

and the Court denies the Motion for Summary Judgment as to this claim.

## IV. Conclusion

The Court grants Defendants' motion for summary judgment to the extent that Defendants argue that Ortiz should be dismissed as a party defendant. The Court otherwise DENIES Defendants' motion for summary judgment.


**IT IS SO ORDERED.**

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge


Dated at Hartford, Connecticut: January 10, 2020